## UNITED STATED DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA – MIAMI DIVISION

| | | |
|---|---|---|
| **SHOW ME HOSPITALITY, LLC, a** Missouri limited liability company, | ) ) ) | **Case No. _____** |
| Plaintiff, | ) ) | |
| **v.** | ) ) | |
| **TIM HORTONS USA INC.,** a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

Plaintiff Show Me Hospitality, LLC ("Plaintiff" or "Show Me Hospitality"), for its Complaint against Defendant Tim Hortons USA Inc. ("Defendant" or "THUSA"), states and alleges as follows:

### I.  INTRODUCTION

1.      Show Me Hospitality entered into an Area Development Agreement (the "ADA") with THUSA in May of 2014 to develop 40 Tim Hortons-brand restaurants ("Restaurants") in five years and 90 Restaurants in 15 years in the St. Louis, Missouri area.  Show Me Hospitality had secured its financing and built its team to meet its obligations under the ADA. Everything changed in December of 2014, however, when a Brazilian-based investment firm, 3G Capital, formed Restaurant Brands International, Inc. ("RBI"), for the purpose of acquiring Burger King and later, Tim Hortons[1] (including THUSA).

---

[1] We will use the term "Tim Hortons" to represent all the corporate entities involved in the Tim Hortons business. These entities include THUSA, which is the franchisor for Tim Hortons franchises in the United States; TDL Group Corp. ("TDL"), which sells various products to Tim Hortons franchisees and is the franchisor for Tim Hortons franchisees in Canada; THD Coffee Co., which also sells various products to

2.      Following the acquisition, Tim Hortons' new owners had no interest in expanding THUSA's U.S. footprint as contemplated under the ADA.  Rather, Tim Hortons' new owners wanted area developers in the United States to commit to developing more than 200 Restaurants per market in 10 years.

3.      Following the ownership change, THUSA told Show Me Hospitality that THUSA fully expected Show Me Hospibility to rip up the ADA and replace it with an Area Representative Agreement (the "ARA") that would have required Show Me Hospitality to immediately invest $20,000,000 in capital, and eventually invest and/or finance as much $300,000,000, for a development obligation of more than 200 Restaurants.

4.      At the same time, THUSA irresponsibly, and with no immediate contingency plan in place, gutted THUSA's United States headquarters in Dublin, Ohio, by, among other things, firing most of the employees with whom Show Me Hospitality had been working, and leaving Show Me Hospitality without the support THUSA had contractually agreed to provide so that Show Me Hospitality could meet its development obligations under the ADA.

5.      More specifically, THUSA lost records previously provided by Show Me Hospitality, failed to communicate with Show Me Hospitality, and delayed, perhaps intentionally, or simply denied sites submitted by Show Me Hospitality even though those sites met THUSA's objective site standards. These breaches of THUSA's contractual obligations under the ADA significantly hindered Show Me Hospitality from developing Restaurants because Show Me Hospitality already had spent much of its resources during the fall of 2015 and

---

Tim Hortons franchisees; Tim Donut U.S. Limited, Inc., which either owns and leases, or will lease and then sublease, the premises from which most of Tim Hortons franchisees operate their franchises; and TimFox Properties, LLC, which leases or subleases the properties for several Tim Hortons franchisees in the State of New York.

the first few months of 2016 reeducating THUSA's new team by resubmitting site proposals and other information that Show Me Hospitality previously had provided to THUSA's old team.

6.      THUSA's extreme cost-cutting led to a harmful transition, operation deficiencies by THUSA under the ADA and Show Me Hospitality's existing franchise agreements, essentially non-existent support, and repeated failures to timely respond to Show Me Hospitality's previous site submittals.  This caused Show Me Hospitality to spend more time and money than it had planned or would have had to with proper support, to fall behind in its development obligations under the ADA, and to lose crucial revenue from Restaurants that it otherwise would have opened.

7.       Show Me Hospitality eventually found ideal partners with significant capital, and development, operational and commercial real estate capabilities who were willing to immediately invest $2,430,000 to ensure that Show Me Hospitality could recover from the damage THUSA's breaches of its obligations had caused, and to meet Show Me Hospitality's initial development obligations under the ADA.

8.      Thereafter, several members of Show Me Hospitality and its potential new partners flew to Tim Hortons' global headquarters in Oakville, Canada in June 2016 to meet with THUSA's executive team, present their partnership agreement, and, as a showing of good faith, commit to voluntarily slightly accelerate Show Me Hospitality's development obligations under the ADA.

9.      Before Show Me Hospitality could even get into the details of its proposal, Tim Hortons' then-brand president, Elias Diaz Sese, gave Show Me Hospitality an ultimatum: either Show Me Hospitality would commit to the ARA, which required Show Me Hospitality to

increase its initial development obligation from 40 to 205 Restaurants and to invest at least $20,000,000 into the business, or THUSA no longer would support the ADA.

10.     In fact, THUSA already had stopped supporting the ADA by, among other things, failing to market Restaurants in St. Louis, and rejecting without a basis, withholding, and/or delaying development and building approvals.

11.     About a week later, and after several meetings, phone calls, and emails, Show Me Hospitality's promising new partners backed out, citing concerns with the unreasonable demands THUSA placed upon Show Me Hospitality at the meeting in Oakville, and concluding that THUSA's ultimate termination of the ADA seemed "inevitable" if Show Me Hospitality did not commit to the ARA and the vastly accelerated development obligation.

12.     Following the meeting, THUSA continued to hinder Show Me Hospitality's ability to remain current on its development obligations by telling Sigurdson not to even bother with certain development proposals, continuing to withhold other approvals and refusing to provide the marketing/advertising support in the St. Louis market that it had promised.

13.     Without additional capital from its would-be new partners, Show Me Hospitality still opened two more Restaurants in the next several months because it already had made commitments of which it could not abandon.  Even with those two openings, however, Show Me Hospitality remained behind in its development obligations under the ADA, and, given its now limited financial resources due to THUSA's repudiation and repeated breaches of the ADA and franchise agreements, unlikely to catch up.

14.     THUSA's repudiation of its ongoing obligations under the ADA derailed Show Me Hospitality's ability to develop the Restaurants to such a degree that it not only excused

Show Me Hospitality from further performance under the ADA, but also now entitles Show Me Hospitality to the damages caused thereby.

15.     As more fully explained below, THUSA's actions constitute an anticipatory breach of contract, breach of contract and breach of the implied covenant of good faith and fair dealing, and tortious interference with business expectancy. THUSA also breached the franchise agreements.

16.     Show Me Hospitality now seeks to recover the damages it has suffered, and will continue to suffer, as a result of THUSA's breaches of both the ADA and the six underlying franchise agreements, and THUSA's tortious interference.

## II.   PARTIES

17.     Plaintiff Show Me Hospitality is a Missouri limited-liability company with its principal place of business in St. Louis County, Missouri.  None of Show Me Hospitality's members resides in the State of Florida.

18.     Defendant Tim Hortons USA Inc. is a Delaware corporation with its principal place of business in Miami-Dade County, Florida.

## III.   JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiff and Defendant, and the amount in controversy is reasonably believed to be in excess of $75,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Florida.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant's principal place of business is in Florida and the applicable ADA and Franchise

Agreements provide that all disputes be resolved in the federal district court covering the location at which Defendant has its principal place of business at the time the action is commenced.

## IV.   FACTUAL BACKGROUND

22.     Eric Sigurdson, the President and Founder of Show Me Hospitality, was born and raised in Manitoba, Canada.  Prior to moving to the United States, he spent several years working professionally in Canada in various roles as a chief financial officer, executive vice president, president, and director of various entities.

23.     In 1996, Sigurdson became an area developer and franchisee for Krispy Kreme in eastern Missouri, Illinois, and northwest Indiana, and led the aggressive growth of more than 20 Krispy Kreme factory stores before selling to a NYSE-listed private equity firm in 2006. Afterward, Sigurdson spent several years working as a senior partner at a business advisory firm, which frequently brought him back to Canada.

24.     As a Canadian expatriate, Sigurdson had long been familiar with Tim Hortons as a coffee and donut shop.  While visiting Canada for business after selling his Krispy Kreme stores, Sigurdson became reacquainted with the Tim Hortons brand and its expanded menu, which offered not just coffee and donuts, but also hot and cold specialty drinks (including lattes, cappuccinos and espresso shots), specialty teas and fruit smoothies, fresh baked goods, grilled panini and classic sandwiches, wraps, soups, prepared foods and other food products.

25.     After consistently observing lines of customers outside the door during lunchtime at these Canadian Tim Hortons restaurants, and given his prior experience at Krispy Kreme, Sigurdson saw an opportunity to develop Tim Hortons restaurants in his new hometown, the greater St. Louis area.

26.     For several years, Sigurdson wrote letters to the senior executives of Tim Hortons, presenting his team as the right partner and St. Louis as the right market for Tim Hortons to expand its growth into the United States.

27.     Sigurdson's letters elicited no responses for a number of years, until 2013, when Tim Hortons' then-new CEO, Mark Caira, responded to one of Sigurdson's letters.

28.     Caira had identified the United States as a "must win" market for Tim Hortons and began implementing a strategic plan for Tim Hortons to achieve more rapid growth in the United States by transitioning from individual franchisees to multi-unit area developers.

29.     In September of 2013, several Tim Hortons executives visited Sigurdson and his initial team of partners, and, in February of 2014, Sigurdson, on behalf of his company, Show Me Hospitality, signed a letter of intent with THUSA for the development of Tim Hortons' restaurants in the greater St. Louis market.

30.     Eventually, Sigurdson and THUSA agreed that Show Me Hospitality would receive exclusive development rights in the greater St. Louis area and the right to develop 40 Restaurants in five years and 90 Restaurants in 15 years, which included the ability of Show Me Hospitality to open both kiosks and carts (in addition to free-standing restaurants).

31.     On April 16, 2014, THUSA provided Show Me Hospitality with its FDD dated April 1, 2014.

32.     The FDD stated at Item 8 that: "[THUSA] will derive commissions and/or revenues from [Show Me Hospitality's] purchase of Items from [THUSA], [THUSA's affiliates] and/or other designated suppliers."

33.     Notably, however, THUSA did not reserve for itself with Item 8 the right to charge the franchisee a "mark-up" of Items (such as equipment) purchased by Show Me Hospitality.

34.     The FDD also stated at Item 8 that "[THUSA] or TDL[2] occasionally receive rebates from suppliers" and that "[a]ny amount received which is attributable to purchases by Shops (franchised, company-owned, and affiliate-owned) is contributed by [THUSA] or TDL to [Tim Hortons'] system-wide advertising fund."

35.     THUSA and Show Me Hospitality executed the ADA on May 30, 2014.  THUSA also required Sigurdson to sign a personal guarantee.  (A copy of the ADA is attached as **Exhibit 1**.)

36.     The ADA development schedule ("Development Schedule") required Show Me Hospitality to develop 40 Restaurants in the five-year Initial Term, and authorized Show Me Hospitality to open an additional 30 Restaurants in the five-year First Option Term and 20 additional Restaurants in the five-year Second Option Term.

37.     The ADA required Show Me Hospitality to construct a minimum number of "Standard" Restaurants, and to construct a maximum number of "Non-Standard B" Restaurants, as those terms are defined in the ADA at Section 3.02(B).  The ADA included no restrictions on the number of "Non-Standard A" Restaurants that Show Me Hospitality could construct.

38.      Section 4.01 of the ADA required that, prior to entering into a franchise agreement for a particular Restaurant (hereinafter "Franchise Agreement" or "Franchise Agreements"), Show Me Hospitality propose a location ("Franchised Business Premises") for such Restaurant and submit to THUSA a Real Estate Package.  The ADA also required that,

---

[2] At Item 1 of the FDD, Tim Hortons described its affiliation with TDL: "We also are an affiliate of The TDL Group Corp. ("**TDL**"). Since January 1965, TDL has sold franchises in Canada, which are similar to the franchises being offered by Tim Hortons in the United States."

within 30 days of THUSA's receipt of the Real Estate Package, THUSA had to deliver notice to Show Me Hospitality either approving or rejecting the proposed Franchised Business Premises, and that THUSA would not unreasonably withhold its approval.  Section 4.01 further stated that THUSA's failure to deliver notice of approval or rejection within 30 days would be deemed a rejection.

39.     Section 6.01 of the ADA required Show Me Hospitality to pay one-half of the $925,000 in franchise fees for the original 40 Restaurants ($462,500) as a development fee upon signing the ADA. Section 8.02(A) of the ADA stated that, upon signing a franchise agreement for each new Restaurant, Show Me Hospitality would pay the balance of each franchise fee (which would be half of the full franchise fee), and THUSA would then refund the franchise fee payment to Show Me Hospitality upon the Restaurant's opening.

40.     Section 8.02(B) provided Show Me Hospitality with significant royalties reductions from the standard 6% of gross sales (with some royalties requirements as low as 1% of gross sales) for Standard Restaurants developed during the Initial Term.

41.     Section 8.02(C) specified that Show Me Hospitality would be entitled to a return of three quarters of its 4% of gross sales advertising fund contributions (meaning Show Me Hospitality would receive 3% of gross sales back), which would allow Show Me Hospitality to control advertising within the St. Louis area.

42.     THUSA agreed at Section 9.01, and pursuant to the Franchise Agreements, to offer and perform training, instruction, assistance and other activities.  THUSA also agreed to assist Show Me Hospitality during the Initial Term of the ADA to promote general public recognition and acceptance of the Tim Hortons brand in the Development Territory, and to promote the Restaurants Show Me Hospitality would open and operate.

43.     Section 10.05 of the ADA included an express good faith and fair dealing clause, entitled "Best Efforts; Cooperation," which stated in part:

> You and we agree to act in good faith and use best efforts to comply with each of our respective obligations under this Agreement, and to cooperate with each other in accomplishing the purposes of this Agreement.

44.     Section 13.02 of the ADA addressed the assignment of the ADA by Show Me Hospitality, and stated that Show Me Hospitality had to first obtain THUSA's prior written consent for any sale of its interests to any third party.  THUSA also agreed at Section 13.02 of the ADA that it would not unreasonably withhold its consent to an assignment of the Agreement by Show Me Hospitality if Show Me Hospitality verified that subsequent to the assignment, Sigurdson would retain a controlling interest in or control the majority of the voting rights in assignees, and, that no assignment would affect Sigurdson's guarantee..

45.     Sections 7.02, 16.01, 16.02 and 16.03 of the ADA set forth the exclusive grounds upon which THUSA could terminate the ADA. Section 7.02 stated that one such ground was a failure by Show Me Hospitality to meet its development obligations (unless such failure was due to an act or omission by THUSA). Other than the other specific references in Sections 16.01-16.03 (none of which applies here), the ADA provided no other grounds for THUSA to terminate the ADA prior to the natural expiration of its term (and any subsequent optional terms).

46.     The ADA stated at Section 8.01, entitled "Execution of Franchise Agreements," that Show Me Hospitality and THUSA would execute a Franchise Agreement for each Restaurant Show Me Hospitality eventually opened pursuant to the Development Schedule, and that each Franchise Agreement would be in the form of Exhibit B to the ADA for Restaurants opened during the Initial Term.

10

47.    The Franchise Agreements stated at Section 3.03 that THUSA would provide Show Me Hospitality with "Ongoing Assistance," described as "on-going advisory assistance to Franchisee concerning the marketing, merchandising, and general business operations of the Franchised Business, as Franchisor deems appropriate."  *See* Show Me Hospitality's Franchise Agreements at § 3.03.   (Show Me Hospitality's Franchise Agreements with THUSA for Restaurant Nos. 6033, 6034, 6193, 6277, 6607, and 6612 are attached hereto as **Exhibit 2**.)

48.    The Franchise Agreements stated at Section 8.00 that "[Show Me Hospitality] shall contribute to advertising, each month, an amount equal to four percent (4%) of the Gross Sales of the Franchised Business for the preceding month. Said contribution shall be paid to the system advertising fund, The Tim's National Advertising Program, Inc. (hereinafter, **"TNAP"),** which shall operate subject to the provision of Section 8.02 herein."

49.    Consistent with Section 8.02(C) in the ADA, Section 8.00 of the Franchise Agreements further stated that Show Me Hospitality would be entitled to a return of three quarters of its 4% of gross sales advertising fund contributions (meaning Show Me Hospitality would receive 3% of gross sales back), which would allow Show Me Hospitality to control advertising within the St. Louis area.

50.    At Section 8.02 of the Franchise Agreements, entitled "TNAP," THUSA agreed that:

i.    TNAP, all contributions thereto, and any earnings thereon, shall be used exclusively to meet any and all costs of maintaining, administering, directing, conducting, and developing advertising, marketing, public relations, and/or promotional programs and materials, and any other activities and related investments and/or initiatives, including but not limited to capital investments, which Franchisor believes will enhance the image of the Tim Hortons System, including, among other things, the costs of preparing and conducting advertising campaigns in various media including the internet; preparation of direct mail advertising; market research; employing advertising and/or public relations agencies to assist therein; purchasing promotional

items; conducting and administering product launches; and providing promotional and other marketing materials and services;

ii.   All payments shall be accounted for separately from the other monies of Franchisor and shall not be used to defray any expenses of Franchisor, except for such reasonable costs and overhead, if any, as may be incurred in activities reasonably related to the administration or direction of TNAP and advertising programs including, among other things, costs of personnel for creating and implementing advertising, promotional, and marketing programs; and

iii.  Franchisor shall maintain separate accounts for TNAP.

(*See* **Ex. 2,** Franchise Agreements at Sections 8.02(a), (c) (emphasis added).[3])

51.    At the time that the parties executed the ADA, Show Me Hospitality was confident in its ability to perform its obligations so long as THUSA provided its contractually mandated commitment and support.

52.    Sigurdson rented office space and put together a team of professionals with the capability to develop, open and operate 40 Restaurants in the Initial Term.  Show Me Hospitality was confident that after it had opened approximately 10 Restaurants in the first few years, it would have been generating sufficient revenue to sustain its operations, overhead and development obligations.

53.    Show Me Hospitality reasonably expected to meet its Development Schedule and open and operate 40 Restaurants in the Initial Term, and to open and operate an additional 50 Restaurants in the following five years, which was five years before the end of the second option term.   Upon completing the Development Schedule at the end of ten years, Show Me Hospitality's financial models conservatively estimated that it would have built an area development business that would have generated more than $107,000,000 in annual sales and a 15% EBITDA, which would generate annual profits of $16.05 million. Show Me Hospitality also

---

[3] The FDDs that THUSA provided to Show Me Hospitality, at Item 11, contain the same obligations noted in Sections 8.02(a) and (c) of the Franchise Agreement.

reasonably believed that it then would have been able to sell these Restaurants for a multiple of seven times EBITDA, which would be $112,350,000. This amount would be in addition to an already realized surplus of undistributed cash of $13,000,000, for a total value of $125,350,000.

***Show Me Hospitality begins developing franchised Restaurants.***

54.     Upon executing the ADA in the spring of 2014, Show Me Hospitality immediately began working toward opening Restaurants.

55.     Show Me Hospitality identified several locations, presented Real Estate Packages to THUSA's headquarters in Dublin, Ohio, and received approval for such locations, including: two Non-Standard B Restaurants (carts) at the Scottrade Center in St. Louis, Missouri, where the St. Louis Blues hockey team played; a Standard Restaurant in Maplewood, Missouri; a Non-Standard Restaurant (kiosk) in Frontenac, Missouri; a Standard Restaurant in the BJC Commons in the Cortex District of St. Louis; and a Standard Restaurant in downtown St. Louis.

56.     Thereafter, Show Me Hospitality worked closely with THUSA's real estate, design, construction and equipment teams at THUSA's headquarters in Dublin, Ohio, to design, construct and equip Show Me Hospitality's first Restaurants.

57.     Show Me Hospitality opened its first two Restaurants in December 2014, when it installed two Non-Standard B Restaurants (carts) at the Scottrade Center in St. Louis.

***A global investment firm acquires Tim Hortons in December of 2014.***

58.     Shortly after Show Me Hospitality entered into the ADA and began working toward its development obligations, in December of 2014, Burger King Worldwide, Inc. acquired Tim Hortons (including THUSA and TDL) through the newly formed entity, RBI, which global investment firm 3G Capital had formed for this very purpose.

13

59.     Tim Hortons' corporate structure flows all the way to 3G Capital in a tortuous fashion.  According to THUSA's most recent 2016 Franchise Disclosure Document, THUSA is an indirect subsidiary of Burger King Worldwide, Inc., which is an indirect subsidiary of Restaurant Brand International Limited Partnership.  RBI is the general partner of Restaurant Brands International Limited Partnership.  3G Restaurant Brands Holdings LP, a Cayman Islands limited partnership, owns the largest percentage of the combined voting power of RBI.  3G Restaurant Brands Holdings' general partner is 3G Restaurant Brands Holdings General Partner Ltd., a Cayman Islands exempted company.

***THUSA's new regime immediately pressures Show Me Hospitality to more than double its development obligations.***

60.     Following 3G Capital/RBI/Burger King's acquisition of Tim Hortons (including both THUSA and TDL), the new owners terminated nearly all of THUSA's executives (including those executives involved in procuring the ADA with Show Me Hospitality) and replaced them with members of Burger King's executive team.[4]

61.     In December of 2014, the new owners of Tim Hortons appointed Elias Diaz Sese as Tim Hortons' Director and as the Brand President.

62.     At or around the same time, the new owners of Tim Hortons appointed Felipe Athayde as THUSA's Executive Vice President of U.S. Development.[5]

63.     With a new executive team came a new and far more aggressive plan for expansion in the United States; a plan vastly different than the Development Schedule in Show Me Hospitality's ADA.

---

[4] Members of Burger King's executive team are all apostles of 3G Capital.

[5] THUSA in December 2015 promoted Athayde to President of THUSA.

64.     THUSA began pushing its new plan to accelerate Show Me Hospitality's ADA Development Schedule on April 3, 2015, when Diaz Sese and Athayde, along with David Blackmore, the then-new President of THUSA, visited St. Louis for a meeting with Sigurdson and his partners and management team.

65.     On April 16, 2015, Athayde sent Sigurdson an email entitled "Slides for Our Conversation," with an attachment presenting a new agreement, the ARA, to replace the ADA. THUSA dubbed this new agreement the "St. Louis Opportunity."

66.     The ARA required the development of 105 primarily Standard Restaurants[6] in six years in order to achieve THUSA's new desired ratio of one Tim Hortons for every 30,000 people in the ADA Development Territory.

67.     Over the next few months, THUSA ramped up its pressure on Sigurdson and his partners to terminate the ADA and enter into the ARA.

68.     On May 26, 2015, Athayde introduced Sigurdson by email to Stephen Goldstein, whom, earlier that month, THUSA had appointed as Vice President, U.S. Development. THUSA assigned Goldstein to work with Sigurdson to develop the financial model and the "most compelling case" for the ARA in lieu of the ADA.

69.     While Sigurdson already was busy managing the development of several Restaurants, and preparing for the grand opening of Show Me Hospitality's first Standard Restaurant in Maplewood on June 23, 2015, THUSA pressured him to spend his time assisting Goldstein with the preparation of an analysis of the St. Louis Opportunity/ARA.

70.     In fact, several of THUSA's executives, including Athayde, Goldstein, Blackmore and Larry Mench, Vice President of U.S. Operations, planned to visit St. Louis for the grand

---

[6] THUSA noted in the presentation slides that "Standard Outlets have tended to drive highest brand awareness and loyalty, generally leading to higher sales across all outlets."

opening of Show Me Hospitality's first Standard Restaurant and, after the opening, to formally present the St. Louis Opportunity/ARA to Sigurdson and his Show Me Hospitality partners.

71.     In advance of THUSA's presentation, Goldstein sent Sigurdson new presentation slides, entitled, "Tim Hortons St. Louis Opportunity – Building Our Partnership."

72.     On June 23, 2015, Show Me Hospitality opened its first Standard Restaurant in Maplewood with very strong sales, and THUSA executives lavished public praise on Show Me Hospitality, calling Show Me Hospitality an exemplary area developer and franchisee.

73.     Despite this public praise, the next day, behind closed doors, THUSA presented the St. Louis Opportunity/ARA to Sigurdson and his partners, and continued to pressure Sigurdson and his partners to tear up the ADA and enter into the ARA.

74.     In the presentation, THUSA outlined its U.S. Expansion Strategy entitled, "The New Vision."

75.     Goldstein summarized THUSA's U.S. Expansion Strategy, with quotes from Josh Kobza, the CFO of RBI, and Daniel Schwartz, the CEO of RBI:

- "We need a more aggressive approach to grow faster . . . the underlying business is doing quite well.  That profitability is what's going to allow us to attract new franchisees . . . ." – Josh Kobza

- "What's going to define success in this transaction for Restaurant Brands International is growth . . . It's all about the growth and our ability to take Tim Hortons all around the world and to expand in the U.S. . . . ." – Daniel Schwartz

(emphasis in original).

76.     During the presentation, Tim Hortons explained that sales in its Canadian and Buffalo, New York markets revealed that Restaurant sales significantly increase when population density reaches 20,000-30,000 per Restaurant in each market, i.e., the success of Tim Hortons' restaurants is closely tied to market penetration.

16

77.     This set the stage for THUSA to pitch Show Me Hospitality on the ARA.

78.     The ARA called for the development of 105 Restaurants in six years, including 57 Standard Restaurants (which are more expensive to construct than kiosks and carts), and for Show Me Hospitality to pay THUSA, on the date of converting the ADA to an ARA, an Area Development Fee of $1,000,000, with THUSA crediting toward that amount the development fees Show Me Hospitality previously had paid to THUSA.

79.     Conversely, the ADA that Show Me Hospitality already had in place called for the development of 40 Restaurants in five years, only 15 Standard Restaurants and a Development Fee of $462,500.

80.     The ARA also required Show Me Hospitality to inject at least $9,000,000 in initial capital to support astronomical increases in construction costs, development costs, and operational costs.

81.     THUSA's presentation left Sigurdson's partners stunned by the magnitude of the required investment and the sheer number of Restaurants that Show Me Hospitality would be required to open in just six years.

82.     After the presentation, THUSA continued to press Show Me Hospitality on the St. Louis Opportunity/ARA.

83.     Goldstein made numerous follow-up inquiries with Sigurdson after the presentation, provided a more detailed financial model, and also offered to arrange a conference call with Show Me Hospitality's partners to discuss the ARA and answer questions.

84.     Sigurdson responded by stating that he and his partners understood the differences between the ADA and ARA, and preferred the ADA, at least at that time, because they were still

gaining an understanding of the development opportunity given that Show Me Hospitality had just opened its first Restaurant.

85.     On October 7, 2015, Diaz Sese sent one of Sigurdson's partners, Paul Mayer, an ambiguous but alarming email stating: "PS.- If I may, you guys should dream big and increase your partnership framework with us per Felipe [Athayde]'s proposal.  The opportunity is now.  It won't be there in a few months…. As a partner…"

***During the same timeframe, THUSA delayed development with wholesale layoffs, inadequate support, prolonged and outright denial of real estate approval requests, and equipment sourcing and purchasing issues.***

86.     Amidst THUSA's wholesale layoffs, and during the timeframe in which THUSA began pressuring Show Me Hospitality to tear up the ADA and enter into the ARA, THUSA caused several prolonged delays to Show Me Hospitality's development of its Restaurants and hindered Show Me Hospitality's ability to operate its existing Restaurants.

87.     While Athayde, Diaz Sese and Goldstein remained in contact with Sigurdson for the purpose of pitching the ARA, THUSA essentially abandoned Show Me Hospitality from an operational standpoint after the acquisition.

88.     In May of 2015, THUSA abruptly closed its United States headquarters in Dublin, Ohio and fired almost all of its employees with whom Show Me Hospitality formerly worked in developing Restaurants, including John Golaszewski, (Director of Franchisee Development), Jeff Baldwin (Sr. Director, Development), Beth Dreitler (Associate General Counsel), Ed Williams (Director U.S. Construction/Engineering), Daniel Blamowski (U.S. Engineering Manager), Ivana Vinski (Restaurant Design Supervisor) and Nathan Lahr (Senior Analyst, Restaurant Design).

89.     Within the next several months, THUSA also fired Jeffery Oleski (Construction Manager) and Lou Terragnoli (Director U.S. Real Estate). Terragnoli had toured several

proposed Restaurant locations with Sigurdson in July of 2015 and had advised that he (meaning Terragnoli) would send information on all the sites to the Real Estate Approval Committee with his recommendation for approval.

90.     Shortly thereafter, in July 2015, Show Me Hospitality submitted Real Estate Packages to THUSA's Real Estate Approval Committee for four Standard Restaurants (O'Fallon, Lafayette, Bridgeton and Highway K), three Non-Standard A Restaurants (kiosks) (St. Anthony's Hospital, St. Anthony's Kirkwood Hospital, and Mercy Hospital), and a Non-Standard B Restaurant (cart) for the Edward Jones Dome where the St. Louis Rams played, but THUSA did not respond to seven of these eight proposals for months.

91.     In fact, with the exception of the Show Me Hospitality's request for the Non-Standard B Restaurant (cart) at the Edward Jones Dome, which THUSA approved and Show Me Hospitality began operating in August 2015, THUSA either lost or destroyed many of the remaining documents Show Me Hospitality previously had provided, including Show Me Hospitality's Real Estate Packages, CAD files, PDF drawings, Restaurant design details and equipment plans. In many cases, Show Me Hospitality previously had received tacit approval from THUSA's former employees for these submissions. Tim Hortons' overall reorganization in general, and THUSA's reorganization in particular, caused significant delays in property, design and construction approvals, as well as delays in Show Me Hospitality's Restaurant operations.

92.     Making matters worse, Tim Hortons had no contingency plan in place after the abrupt closure of THUSA's United States headquarters in Dublin, Ohio, and it took several months for THUSA to even introduce Show Me Hospitality, by email or otherwise, to the new operational/support team in Canada with whom Show Me Hospitality needed to coordinate in order to continue its development.

93.     In September of 2015, after THUSA finally introduced Show Me Hospitality to some of THUSA's incoming operational/support team, Sigurdson expressed his disappointment in a response to an email from John Hrymak (THUSA's Senior Manager, U.S. Development). Sigurdson wrote that, prior to the closing of the Ohio office, Show Me Hospitality and its development team, including its architects, was in constant contact, and worked extensively and collaboratively, with the previous THUSA Ohio team. But even months after the transition, Sigurdson still did not really know the roles and responsibilities of THUSA's new operational/support team, and he had no one to turn to for support.

94.     Ultimately, THUSA's drastic transition and failure to understand Show Me Hospitality's activity in St. Louis, forced Show Me Hospitality to spend the fall of 2015 and the first few months of 2016 reeducating the new THUSA team members, resubmitting documentation, repeating presentations and developing more information for the new THUSA team (including a new Real Estate Approval Committee).

95.     In fact, in December 2015, THUSA's Real Estate Approval Committee rejected all seven pending proposals for development that Show Me Hospitality had provided five months earlier in July.

96.     Later, despite the fact that Show Me Hospitality already had done so, THUSA requested that Show Me Hospitality resubmit a number of these development proposals, including property, Restaurant design and construction documents to THUSA and its Real Estate Approval Committee

97.     Eventually, in response to the Real Estate Approval Committee's continual pushback, Show Me Hospitality had to aggressively pitch what were obviously ideal

development sites in late 2015 and early 2016 for approval, which Show Me Hospitality finally received in January 2016.

98.     THUSA's prolonged approval process for the O'Fallon site was especially damaging because O'Fallon, the largest and most dynamic city in the East Metro area of St. Louis, was, and still is, an ideal site for a Tim Hortons Restaurant.  The O'Fallon site also is adjacent to a major arterial entrance to O'Fallon and next to a new hospital set to open in 2017. Still, Show Me Hospitality had to overcome THUSA's resistance and wait several months to secure THUSA's approval of the O'Fallon Restaurant.

99.     Moreover, because Tim Hortons's new regime believed that Standard (as opposed to Non-Standard) Restaurants would most effectively drive brand awareness and loyalty, in March 2016, Diaz Sese and Athayde refused to approve Show Me Hospitality's ready-to-go Tim Hortons Non-Standard Restaurants (carts) at Ballpark Village at Busch Stadium[7] and Gateway Motorsports race track in Madison, Illinois, and, in August 2016, Diaz Sese told Sigurdson not to even bother with a proposal for a Non-Standard A Restaurant (kiosk) at the Saint Louis Zoo.

100.    THUSA also created unnecessary delays by initially refusing to provide itemized price lists for equipment purchases, which Show Me Hospitality's lenders required.  Only later, after an extended period of time and repeated requests from Show Me Hospitality, did THUSA provide some of these lists.   Upon reviewing the lists, Show Me Hospitality discovered significant and unreasonable "mark-ups" on equipment purchases and inflated management fees.

101.    THUSA's failure to provide line-item pricing for purchases ranging from $265,000 to $350,000 per Restaurant delayed and, in some cases, stopped Show Me Hospitality from securing financing from lenders.

---

[7] Notably, THUSA's Senior Director of Marketing, Matt Breshnahan, formerly had stated when visiting Ballpark Village with one of Show Me Hospitality's partners, that a cart in the stadium was a "no-brainer" from a marketing perspective.

102.    Additionally, Show Me Hospitality's attempt to build out its stores in accordance with THUSA's requirements, and through the utilization of THUSA's antiquated online system for tracking development and construction, was nothing short of a disaster.

103.    In one instance, THUSA's system, Tim Trac, blindly authorized a third-party supplier, without Show Me Hospitality or THUSA's approval, to manufacture millwork and stainless steel equipment based upon outdated plans—work which later needed to be redone.

104.    Tim Trac also authorized another third-party party supplier to begin working toward installing cable and internet services, again without Show Me Hospitality or THUSA's approval.  This resulted in the third-party supplier subcontracting with a cable and internet provider when Show Me Hospitality already had contracted for another cable and internet provider to provide these services at a lower cost.  As a result, both cable and internet providers installed duplicate equipment at Show Me Hospitality's Restaurants.

105.    THUSA also continually forced Show Me Hospitality to wait unreasonable periods of time to obtain the required approval for various supply and equipment purchases.

106.    Adding to these problems, a substantial amount of the equipment and supplies that THUSA required Show Me Hospitality to purchase first had to be transported from the United States to Tim Hortons' global headquarters in Canada, and then back to the United States, resulting in confusion, additional shipping costs and duty charges, as well as a greater potential for damage during transportation.

107.    Indeed, Show Me Hospitality frequently received equipment that it did not order, or, if it did order, was outdated, did not work or was already broken.  In some cases, the warranty already had expired on the broken equipment, and Show Me Hospitality was not reimbursed.

108.     When Sigurdson notified THUSA of these issues, THUSA placed the blame on "the old team" and noted that THUSA had been experiencing similar issues with other franchisees/developers, like Show Me Hospitality, and that THUSA was "trying to pick up the pieces."

109.     While the ADA required Show Me Hospitality to develop at least 40 Restaurants, and THUSA repeatedly pressed for more, it became clear to Show Me Hospitality that THUSA was unprepared to support such growth.

110.     Diaz Sese even acknowledged THUSA's complete failure to fulfill its contractual obligations or provide any support to Show Me Hospitality at the June 28, 2016 meeting (discussed below), when he and Show Me Hospitality's partners were discussing the St. Louis market, and Diaz Sese held up his hand with thumb and finger forming a zero, signifying that Show Me Hospitality's accomplishments in St. Louis had been achieved with zero support from Tim Hortons and THUSA.

111.     THUSA's unreasonable actions and conduct generally not only delayed Show Me Hospitality's development, but severely and adversely impacted its financial affairs.

***Show Me Hospitality began opening Restaurants despite significant delays from THUSA.***

112.     Despite significant delays from THUSA, Show Me Hospitality opened seven Restaurants by the end of its first development year ending December 31, 2015.

113.     Show Me Hospitality opened its first two of these seven Restaurants (two Non-Standard B Restaurants [carts] at the Scottrade Center in St. Louis, Missouri) in December of 2014; its third Restaurant (Standard Restaurant in Maplewood, Missouri) on June 23, 2015; its fourth Restaurant (Non-Standard A Restaurant [kiosk] in Frontenac, Missouri) on August 5, 2015; its fifth Restaurant (Non-Standard B Restaurant [kiosk] at the Edward Jones Dome in St.

Louis, Missouri) on August 23, 2015; its sixth Restaurant (Standard Restaurant in the Cortex District/BJC Commons area of St. Louis, Missouri) on October 29, 2015; and its seventh Restaurant (Standard Restaurant at Park Pacific in St. Louis, Missouri) on December 21, 2015.

***Tim Hortons and THUSA misappropriated TNAP funds.***

114.    Upon information and belief, during the course of Show Me Hospitality's franchise operations, in direct violation of Show Me Hospitality's Franchise Agreements, and contrary to its disclosure in the FDD, Tim Hortons in general and THUSA in particular misappropriated monies from the TNAP by taking monies out of the TNAP and using them to defray expenses unrelated to the TNAP.

115.    Upon information and belief, during the course of Show Me Hospitality's franchise operations, and contrary to its disclosure in the FDD, THUSA failed to contribute all rebates it received from suppliers to the TNAP.

116.    Tim Hortons' new owners also began dictating franchisee menu prices and, on information and belief, began taking greater markups and/or supplier rebates on food and beverage ingredients and items, which increased Show Me Hospitality's cost of goods sold and diminished Show Me Hospitality's profitability.

***Show Me Hospitality attracted ideal additional investors with significant development experience.***

117.    By 2016, as a result of THUSA's transition following the acquisition, and THUSA's significant distractions, delays and failure to meet its contractual obligations, all of which had a substantial negative impact on Show Me Hospitality's finances, Show Me Hospitality fell behind on its development obligations, which also had a substantial negative impact on its revenue.

118.     As a result, it became critical for Show Me Hospitality to infuse additional capital in order to continue developing Restaurants in accordance with the Development Schedule.

119.     Sigurdson found an ideal partner, RSW Group, whose members, Jeff Tottleben, Bill Cawley, and Brian Neitzel, had successfully developed and later sold a national chain of 200 AT&T retail stores.

120.     After RSW Group expressed an interest in making a substantial capital investment in Show Me Hospitality and becoming a partner, Sigurdson and Tottleben worked to finalize a partnership agreement.  In addition to benefitting from substantial additional capital under the arrangement, Show Me Hospitality would benefit by making Tottleben an active partner and leveraging Cawley and Neitzel's commercial real estate expertise and company, Cawley Partners, for additional real estate development capabilities.

121.     By June of 2016, Show Me Hospitality and RSW Group came to terms on an Amended and Restated Operating Agreement in which RSW Group would invest approximately $2,430,000 to become a 26% shareholder in Show Me Hospitality, with the option in one year to purchase an additional 8% of Show Me Hospitality's shares for $800,000.[8]   Show Me Hospitality and RSW Group's attorneys also prepared a "Consent and Amendment" that Show Me Hospitality would propose for THUSA's execution upon receiving its blessing.

***THUSA derailed Show Me Hospitality's capital infusion by repudiating the ADA and offering an ultimatum.***

122.     In June of 2016, Sigurdson contacted Diaz Sese and Athayde to schedule a meeting to introduce RSW Group and obtain THUSA's blessing. In advance of this meeting,

---

[8] Upon RSW Group investing in Show Me Hospitality, Show Me Hospitality's existing partners also agreed to collectively contribute approximately $1,000,000 in additional capital, bringing the total immediate capital infusion to approximately $3,375,000.

Sigurdson provided THUSA with background information on each of the RSW Group members who would be attending the meeting.

123.     On June 28, 2016, Sigurdson and one of his partners, Paul Mayer, along with Tottleben, Cawley and Neitzel of RSW Group met with Diaz Sese, Athayde, Goldstein and other THUSA executives in Oakville, Canada, at Tim Hortons' Canadian headquarters near Toronto to propose the new partnership.

124.     The meeting began with Tottleben, Cawley and Neitzel presenting an overview of their experience in developing a national retail chain of over 200 AT&T stores and their substantial commercial real estate capabilities.  Together, they expressed their enthusiasm with regard to Show Me Hospitality, Tim Hortons and the St. Louis market, as well as their commitment to infuse $2,430,000 in capital in Show Me Hospitality.

125.     Furthermore, with the understanding that THUSA wanted to significantly accelerate the Development Schedule in accordance with the St. Louis Opportunity/ARA, Show Me Hospitality/RSW Group offered to accelerate the ADA Development Schedule to 90 Restaurants over ten years, as opposed to 15 years in the current ADA.

126.     Approximately 30-45 minutes into RSW Group's presentation, Diaz Sese became overtly hostile, interrupted and launched a stunning rebuke of the Show Me Hospitality/RSW Group proposal.

127.     Diaz Sese essentially rejected the new partnership and the proposal to modestly accelerate the Development Schedule, stating that $2,430,000 and 90 Restaurants was not enough, and that there was only one way forward – to commit to the ARA and to develop 205 Restaurants over ten years in the St. Louis market, which would require $20,000,000 in capital

investment (as opposed to the 105 Restaurants and $9,000,000 capital investment THUSA proposed just a few months earlier as the "St. Louis Opportunity").

128.     To put this in perspective, McDonald's has approximately 130 restaurants in the comparable St. Louis region, which it developed over a 40-year period!

129.     Diaz Sese was clear that THUSA would not support the ADA, and that, if Show Me Hospitality did not enter into the ARA, commit to developing 205 Restaurants over ten years and invest $20,000,000 in capital, it was inevitable that a future meeting would occur wherein termination of the ADA would be certain.

130.     Diaz Sese would not even discuss the partnership proposal, implying that THUSA would not even entertain the approval of RSW Group until Show Me Hospitality agreed to enter into the ARA and expand its development obligations.

131.     Diaz Sese's demeanor and stern comments, which Mayer later described in an email to Sigurdson as a "tantrum," left everyone from Show Me Hospitality and the RSW Group dumbstruck, as they had come to THUSA with a capable partner willing to substantially increase Show Me Hospitality's capital structure, and commit to accelerating the ADA Development Schedule.  Everyone from Show Me Hospitality and the RSW Group in attendance of the June 28, 2016 meeting left convinced that THUSA planned to strip Show Me Hospitality of the ADA.

132.     The next day, Tottleben, on behalf of RSW Group, in an email to Sigurdson, declined to move forward, citing serious concerns with THUSA after the meeting.

133.     Tottleben wrote that he assumed THUSA would not approve RSW Group without an agreement to terminate the ADA and enter into the ARA; that RSW Group found it disturbing that termination of the ADA seemed "inevitable"; that an upfront requirement to develop 205 Restaurants and an investment of $20,000,000, with THUSA being unwilling "to even discuss

27

honoring or modifying (to go faster)" the current ADA, took RSW Group out of the picture; and that it appeared to be a one-way street with the new THUSA's new regime since THUSA's old team negotiated the ADA, and that THUSA's new team now wanted nothing to do with trying to make the ADA work.

134.    Making matters worse, as a result of THUSA's hostile position at the June 28, 2016 meeting, Show Me Hospitality's existing investors became alarmed and apprehensive to invest additional capital.

135.    After the June 28, 2016 meeting, Athayde contacted Sigurdson and briefly backpedaled, telling Sigurdson that THUSA liked the additional investors, and that there was a "misunderstanding" regarding the 205 Restaurants proposed under an ARA.

136.    While Athayde's backpedaling did result in additional dialogue about the possibility of entering into a form of the proposed ARA, later, THUSA continued to insist upon the ARA, 205 Restaurants and $20,000,000 in capital.  Ultimately, RSW Group was still not interested in the opportunity because the commitments demanded by THUSA were too extreme.

***Show Me Hospitality's Tim Hortons Restaurants suffered low sales due to lack of marketing and support.***

137.    In the fall of 2015, THUSA began suggesting that Show Me Hospitality relinquish its contractual right to receive a rebate of three-quarters of its 4% of gross sales advertising fund payments (which Show Me Hospitality used for local area marketing), and allow THUSA to keep and utilize the entire 4% of gross sales advertising fund payments to take over Show Me Hospitality's marketing responsibilities in the St. Louis market.

138.    Eventually, in early 2016, Sage Linn, the Senior Marketing Manager for THUSA, Tina Bryan, a Show Me Hospitality member, and Rick Orf, Show Me Hospitality's senior operations manager, agreed that Show Me Hospitality would relinquish its advertising fee rebate,

turn over marketing in the St. Louis market to THUSA, and participate fully in THUSA's advertising programs.

139.     As a result, in reliance on THUSA's commitment to market in St. Louis, Show Me Hospitality relinquished its right to receive a rebate of three-quarters of its 4% of gross advertising fund payments (and THUSA retained this money), and Show Me Hospitality discontinued its advertising activities.

140.     Unfortunately, through a series of events, delays, changing marketing agencies, and outright disregard and stalling, THUSA provided absolutely no advertising in the St. Louis market or any advertising support through the second and third quarters of 2016, and only miniscule billboard and free standing inserts (promotional pieces inserted in newspapers, flyers, coupon books, etc.) in the fourth quarter of 2016 and first quarter of 2017.

141.     When Sigurdson mentioned this to Athayde, in or around August of 2016, Athayde denied that THUSA ever agreed to take over marketing in the St. Louis market.

142.     THUSA did nothing more, and Show Me Hospitality never received the advertising in the St. Louis market that THUSA agreed to provide in early 2016.

143.     THUSA's failure to provide advertising, or any meaningful marketing support or assistance, has had a significant detrimental effect on Show Me Hospitality's Restaurant sales at the worst possible time, given that Show Me Hospitality needed to gain momentum for the Tim Hortons' brand in the St. Louis market, and needed the additional revenue to support its new development.

144.     THUSA's advertising/marketing inaction notably coincided with its repudiation of its obligations under the ADA and its attempt to force Show Me Hospitality to enter into the ARA, or otherwise drive Show Me Hospitality out of business.

***THUSA had final discussions with RSW Group.***

145.     Later in the fall of 2016, Diaz Sese and Athayde persisted in their pursuit of the ARA, and asked Sigurdson to reengage Tottleben and the RSW Group about the possibility of partnering with Show Me Hospitality for the accelerated development of Tim Hortons Restaurants in the St. Louis market.

146.     This culminated in additional discussions and meetings in September 12, 2016 in St. Louis, Missouri and September 28, 2016 in Dallas, Texas with members of THUSA, RSW Group and Show Me Hospitality in attendance.[9]  At these meetings, THUSA continued to insist upon the ARA structure.

147.     Ultimately, RSW Group refused to commit to the ARA, the accelerated development schedule and the substantial upfront capital requirements that THUSA continued to demand, stating that that it felt the ARA requirements were "irresponsible" and that Show Me Hospitality could not achieve THUSA's growth targets while maintaining proper operational and financial discipline and controls.

148.     This marked the end of RSW Group's discussions with THUSA, and, given THUSA's refusal to back off of the ARA model, was the ultimate death knell to Show Me Hospitality's ability to raise the additional capital it needed to meet its development obligations.

***Show Me Hospitality opened two more Restaurants but reached a standstill with THUSA.***

149.     Ultimately, Show Me Hospitality managed to open the last two Restaurants that already were already in the pipeline at the time THUSA repudiated its contractual obligations under the ADA in 2016, and for which Show Me Hospitality had, prior to the June 28, 2016

---

[9] Prior to these meetings, THUSA specifically requested to Tottleben that Sigurdson and Show Me Hospitality not be included.  RSW Group found this request strange and requested that Sigurdson at least be allowed to attend certain portions of the September 12, 2016 meeting in St. Louis.

meeting, secured real estate – a Standard Restaurant in O'Fallon, Illinois on August 11, 2016 and a Standard Restaurant in Lafayette Square in St. Louis, Missouri on December 30, 2016.

150.     THUSA's unlawful conduct drained Show Me Hospitality's assets.  Since its repudiation, THUSA has done almost nothing to support Show Me Hospitality under the ADA. All told, Show Me Hospitality has invested more than $8,300,000 toward developing Tim Hortons Restaurants in its Development Territory.

151.     Show Me Hospitality had an option to develop another Restaurant on property located in Bridgeton, Missouri, but could not execute that option because, as a result of THUSA's actions, Show Me Hospitality had neither the finances nor franchisor support that it needed to continue operating as a developer of Tim Hortons' Restaurants. This rejection occurred after Show Me Hospitality had invested significant time, effort and capital in securing all of the approvals for the site, and completing all architectural and civil engineering at a total cost of more than $100,000.

## V.  LEGAL CLAIMS

### COUNT I
### *Anticipatory Breach of Contract*
### *(THUSAS' Anticipatory Breach of the ADA)*

152.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

153.     The ADA is to be governed by Ohio law.  (*See* **Ex. 1**, ADA at § 19.14.)

154.     When a contracting party repudiates the contract prior to the time that such party's performance is due, an "anticipatory breach" or, more precisely, an "anticipatory repudiation" occurs, and the injured party has an immediate action for damages for total breach. *Farmers Comm. Co. v. Burks*, 719 N.E.2d 980 (Ohio Ct. App. 1998).

155.    To prevail on a claim of anticipatory breach of contract, a plaintiff must establish: (1) that there was a contract containing some duty of performance not yet due; (2) by word or deed, the defendant refused future performance; and (3) damage to the plaintiff. *Metz v. Am. Elec. Power Co.*, 877 N.E.2d 316, 323 (Ohio Ct. App. 2007).

156.    On May 30, 2014, THUSA and Show Me Hospitality entered into the ADA as set forth above.  The ADA constitutes a valid and enforceable contract between the two parties.

157.    Show Me Hospitality performed all of its obligations to date on its part in accordance with the ADA, except to the extent THUSA's acts and omissions (described above) excused or materially and adversely affected Show Me Hospitality from performing those obligations.

158.    THUSA anticipatorily breached the ADA by unequivocally repudiating, without a basis, its obligation to honor the ADA, support Show Me Hospitality and to allow Show Me Hospitality to develop Tim Hortons Restaurants in Show Me Hospitality's Development Territory.

159.    More specifically, THUSA, upon being acquired by 3G Capital/RBI/Burger King, immediately began pressuring Show Me Hospitality to tear up the ADA, enter into the ARA, commit to immediately investing exorbitant amounts of upfront capital, and accelerate the Development Schedule.

160.    THUSA's pressure to terminate the ADA and enter into the ARA culminated with THUSA's unequivocal repudiation, or ultimatum, at the June 28, 2016 meeting, when Diaz Sese stated that there was only one way forward for Show Me Hospitality– to commit to the ARA and to develop 205 Restaurants over ten years in the St. Louis market, which would require

32

$20,000,000 in capital investment, or THUSA would not support the ADA and would eventually terminate Show Me Hospitality.

161.     Indeed, prior to THUSA's anticipatory repudiation, THUSA already had failed to perform, or adequately perform, its obligations under the ADA.  Diaz Sese's ultimatum at the June 28, 2016 meeting evidenced a clear intention to terminate the ADA and begin searching for a new area developer in the St. Louis market.

162.     In fact, Diaz Sese made sure THUSA followed through on his threat to discontinue THUSA's support of the ADA, by refusing to even consider Show Me Hospitality's proposed partnership with RSW Group absent a commitment to the ARA, all in an effort to coerce Show Me Hospitality into entering the ARA; by telling Sigurdson in August 2016 not to even bother submitting a development proposal for a Non-Standard Restaurant at the Saint Louis Zoo; and by failing to provide marketing/advertising in the St. Louis area (despite insisting upon taking on this obligation and accepting Show Me Hospitality's payments for these services), and, later, outright denying that THUSA agreed to take over Show Me Hospitality's marketing responsibilities.

163.     Since THUSA's repudiation, THUSA failed to perform any other obligations under the ADA because there was nothing left for it to do.  Its repudiation and refusal to even consider  RSW Group (absent a commitment to the ARA) was all THUSA needed to do to inevitably force Show Me Hospitality out of business.  This left Show Me Hospitality without the capital necessary to continue its development of Tim Hortons Restaurants, without the ability to attract additional investors, and with no way forward.

164.     Indeed, even if Show Me Hospitality were to attract additional investors, Show Me Hospitality has no reason to believe that THUSA will consider, let alone approve, their

investment absent a commitment from Show Me Hospitality to enter into the ARA, commit to developing 205 Restaurants over ten years and investing $20,000,000 in capital.

165.    As a direct and proximate result of THUSA's anticipatory repudiation of the ADA, Show Me Hospitality has been damaged and continues to be damaged, and Show Me Hospitality is entitled to recover such damages.

166.    Show Me Hospitality now seeks a judgment of damages in an amount that will compensate Show Me Hospitality for the profits Show Me Hospitality would have received from its Restaurants had THUSA performed its obligations under the ADA, which means the actual lost value of the ADA, plus interest thereon and attorneys' fees and costs as permitted under the ADA. (*See* **Ex. 1**, ADA at § 19.13.)

**COUNT II**
***Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing***
***(THUSA's Breach of the ADA)***

167.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

168.    Ohio law governs the ADA. (*See* **Ex. 1**, ADA at § 19.14.)

169.    The elements of a breach of contract under Ohio law are: the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *See Am. Sales, Inc. v. Boffo*, 71 Ohio App.3d 168 (1991); *Doner v. Snapp,* 649 N.E.2d 42 (Ohio App. 2 Dist. 1994).

170.    Furthermore, in every contract, by operation of law, there is an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing in the trade.  *Ireton v. JTD Realty Invests., L.L.C.*, 162 Ohio Misc. 2d 1, 22, 944 N.E.2d 1238, 1255 (2010), citing *Littlejohn v. Parrish*, 839 N.E.2d 49, ¶ 27 (Ohio Ct. App. 2005).

171.      Pursuant to the implied covenant of good faith and fair dealing in every contract, when one party takes on an obligation to provide services, e.g., assistance and support, it is not enough that the party simply provided some of these services; rather, when it has the contractual obligation to provide these services it must do so ***adequately***.  *See Jade Grp., Inc. v. Cottman Transmission Centers, LLC*, No. CV 16-01237, 2016 WL 3763024, at *7 (E.D. Pa. July 13, 2016) (noting that it is reasonable to interpret a contractual obligation to provide marketing/advertising assistance as an obligation "to provide a certain level of advertising services—not merely requiring it to provide some advertising services.").  *See also Physicians Weight Loss Centers of America v. Creighton*, No. 90-CV-2066, Bus. Franchise Guide (CCH) ¶ 9982 (N.D. Ohio Mar. 30, 1992).

172.      THUSA breached several express provisions of the ADA.

173.      On several occasions, THUSA unreasonably failed to respond to, delayed, or outright rejected, without a basis, Show Me Hospitality's development proposals.  (*See* **Ex. 1**, ADA at § 4.01.)

174.      As described above, during and after the acquisition and transition period, THUSA essentially abandoned Show Me Hospitality from an operational standpoint, and thereby failed to offer and perform training, instruction, assistance and other activities for which the Franchise Agreements provide, i.e., "on-going advisory assistance to Franchisee concerning the marketing, merchandising, and general business operations of the Franchised Business . . . ." (*See* **Ex. 1**, ADA at § 9.01 and **Ex. 2**, Franchise Agreements at § 3.03.)

175.      In early 2016, THUSA insisted that Show Me Hospitality pay THUSA to take over marketing entirely for the St. Louis market but, it ultimately failed to do so, and, later denied that any such agreement existed.

176. THUSA also unreasonably, uncooperatively and in bad faith refused to consider Show Me Hospitality's proposed partner, RSW Group, in an effort to coerce Show Me Hospitality into entering the ARA. (*See* **Ex. 1**, ADA §§ 10.05, 13.02.)

177. THUSA has breached its express obligations under the ADA, and, when considering THUSA's actions described above as a whole, these actions constitute a de facto or constructive termination of the ADA without good cause and breaches of its express and implied obligation to deal with Show Me Hospitality in good faith, use its best efforts and to perform its contractual obligations adequately. (*See* **Ex. 1**, ADA at §§ 10.05, 16.01, 16.02, 16.03.) *Jade Grp., Inc.*, 2016 WL 3763024, at *7; *Physicians Weight Loss Centers of America*, Bus. Franchise Guide (CCH) ¶ 9982; *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240–41 (7th Cir.) (constructive termination may occur when franchisor attempts to drive its franchisee out of business); *American Business Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1141 (8th Cir.1986) (constructive termination occurred when franchisor refused to continue doing business with its franchisee).

178. Those actions include, without limitation:

- giving an ultimatum in order to coerce Show Me Hospitality to enter into the ARA;

- failing for several months after closing the Ohio office to introduce Show Me Hospitality to its new operational/support team;

- prolonged real estate approvals and outright denial of Non-Standard Restaurants that are permitted under the ADA;

- delaying and refusing to provide itemized equipment price lists;

- requiring Show Me Hospitality to use an antiquated online system for tracking development and construction;

- failing to provide ongoing support and assistance with regard to general business operations;

- suspending its marketing in the St. Louis area; and

- rejecting Show Me Hospitality's much needed equity partner, RSW Group, in an effort to coerce Show Me Hospitality into entering the ARA.

179.    As a direct and proximate result of THUSA's express and implied breaches of the ADA and de facto or constructive termination of the ADA without good cause, Show Me Hospitality has been damaged, and continues to be damaged, and is entitled to recover damages.

180.    Show Me Hospitality now seeks a judgment of damages in an amount that will compensate Show Me Hospitality for the profits Show Me Hospitality would have received from its Restaurants had THUSA performed its obligations under the ADA, which means the actual lost value of the ADA, plus interest thereon and attorneys' fees and costs as permitted under the ADA.  (*See* **Ex. 1**, ADA at § 19.13.)

## COUNT III
### *Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing* *(THUSA's Breach of All of Show Me Hospitality's Franchise Agreements)*

181.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

182.    Florida law governs the Franchise Agreements between Show Me Hospitality and THUSA.[10]

---

[10] While some of Show Me Hospitality's earlier Franchise Agreements provide for Ohio law, Show Me Hospitality's most recent Franchise Agreements call for Florida law and specifically state that all previous Franchise Agreements shall be amended to include this provision.  Specifically, Section 17.05 of several of Show Me Hospitality's Franchise Agreements for Restaurant Nos. 6034, 6193, 6277, 6607, 6612 state:

> Section 17.05 - Applicability to Other Franchise Agreements: If Franchisor and Franchisee have entered into any other franchise agreements for the operation by Franchisee of a Tim Hortons restaurant, such agreements shall be amended by adding the provisions of this Article XVII thereto, and deleting any conflicting provisions of such other agreements.

183.    The elements of a breach-of-contract action under Florida law are: (1) a valid contract; (2) a material breach; and (3) damages.  *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. Dist. Ct. App. 2000).

184.    Furthermore, in every contract, by operation of law, there is an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing in the trade.  *Publix Super Markets, Inc. v. Wilder Corp. of Delaware*, 876 So. 2d 652, 654–55 (Fla. Dist. Ct. App. 2004).

185.    Pursuant to the implied covenant of good faith and fair dealing in every contract, when one party takes on an obligation to provide services, e.g., assistance and support, it is not enough that the party simply provided some of these services; rather, when it has the contractual obligation to provide these services it must do so *adequately*.  *See Jade Grp., Inc.*, 2016 WL 3763024, at *7 *Physicians Weight Loss Centers of America*, Bus. Franchise Guide (CCH) ¶ 9982.

186.    THUSA breached several express provisions of the Franchise Agreements.

187.    As described above, during and after the acquisition and transition period, THUSA essentially abandoned Show Me Hospitality from an operational standpoint, and thereby failed to fulfill its obligation to "provide such other initial and ongoing advisory assistance to [Show ME Hospitality] concerning the marketing, merchandising, and general business operations of the Franchised Business."  (*See* **Ex. 2,** Franchise Agreements at § 3.03.)

188.    In early 2016, THUSA agreed to take over marketing entirely for the St. Louis market, and accepted Show Me Hospitality's payment for this service but, ultimately failed to do so, and, later denied that any such agreement existed.

189.     Upon information and belief, during the course of Show Me Hospitality's franchise operations, in direct violation of Show Me Hospitality's Franchise Agreements, and contrary to its disclosure in the FDD, THUSA misappropriated monies from the TNAP by taking monies out of the TNAP and using them to defray expenses unrelated to the TNAP.  (*See* **Ex. 2** Franchise Agreements at Sections 8.02(a), (c).)

190.     THUSA has breached its express obligations under the ADA, and, when considered as a whole, these actions constitute breaches of its implied obligation to deal with Show Me Hospitality in good faith.  *See Jade Grp., Inc. v. Cottman Transmission Centers, LLC*, 2016 WL 3763024, at *7; *Physicians Weight Loss Centers of America*, Bus. Franchise Guide (CCH) ¶ 9982.

191.     Those actions include, without limitation:

- failing for several months after closing the Ohio office to introduce Show Me Hospitality to its new operational/support team;

- delaying and refusing to provide itemized equipment price lists;

- charging significant and unreasonable "mark-ups" on equipment purchases and charging inflated management costs;

- failing to contribute all rebates it received from suppliers to the TNAP;

- requiring Show Me Hospitality to use an antiquated online system for tracking development and construction;

- failing to provide ongoing support and assistance with regard to general business operations; and

- suspending its marketing in the St. Louis area.

192.     As a direct and proximate result of THUSA's breaches of the Franchise Agreements, and the implied covenant of good faith and fair dealing therein, Show Me Hospitality has been damaged, and continues to be damaged, and is entitled to recover damages.

193.     Show Me Hospitality now seeks a judgment of damages in an amount that will compensate Show Me Hospitality for the profits Show Me Hospitality would have received from its Restaurants had THUSA performed its obligations under the Franchise Agreements, plus interest thereon.  (*See* **Ex. 1**, ADA at § 19.13.)

### *COUNT IV*
### *Tortious Interference with Business Expectancy*
### *(THUSA's Tortious Interference with Show Me Hospitality's Partnership)*

194.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

195.     To prove a claim for tortious interference with a contract or a business expectancy, the plaintiff must prove: (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from defendant's conduct.  *Cent. Trust & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 324 (Mo. 2014); *Rababy v. Metter*, 30 N.E.3d 1018, 1026 (Ohio Ct. App. 2015).

196.     As described above, because of THUSA's distractions, delays and failure to abide by its contractual obligations, it became critical for Show Me Hospitality to infuse additional capital in order to continue developing Restaurants in accordance with the Development Schedule.

197.     Sigurdson attracted an ideal partner, RSW Group, with significant development experience as a national retail store developer and commercial real estate expertise, to invest a minimum of $2,430,000 in Show Me Hospitality.

198.     Show Me Hospitality had a valid business expectancy with RSW Group because Show Me Hospitality and RSW Group had negotiated for months and eventually agreed upon an

40

Amended and Restated Operating Agreement, prior to the June 28, 2016 meeting with THUSA to introduce RSW Group and its partners. Show Me Hospitality and RSW Group even drafted a "Consent and Amendment" that Show Me Hospitality would propose for THUSA's execution upon receiving its blessing.

199.     THUSA had knowledge of Show Me Hospitality's business expectancy and, in fact, set up the June 28, 2016 meeting with THUSA, Sigurdson, and RSW Group for the purpose of introducing RSW Group.

200.     THUSA intentionally interfered with Show Me Hospitality's business expectancy in an effort to coerce Show Me Hospitality to enter into the ARA by unreasonably, uncooperatively and in bad faith refusing to consider Show Me Hospitality's proposed partnership with RSW Group, and inducing or causing RSW Group to back out of the proposed partnership with Show Me Hospitality.

201.     Tottleben made this clear in an email to Sigurdson the day following the June 28, 2016 meeting, when he stated that he assumed that THUSA would not approve RSW Group without an agreement to terminate the ADA and enter into the ARA; that RSW Group found it disturbing that termination of the ADA seemed "inevitable"; that an upfront requirement to develop 205 Restaurants and an investment of $20,000,000, with THUSA being unwilling "to even discuss honoring or modifying (to go faster)" the current ADA, took RSW Group out of the picture; and that it appears to be a one-way street with the new THUSA regime since the ADA was negotiated by the old regime and THUSA now wanted nothing to do with trying to make the ADA work.

202.     THUSA had no basis to threaten the termination of the ADA and to give Show Me Hospitality an ultimatum to sign the ARA, no justification for its failure to consider Show

Me Hospitality's proposed partner, and, therefore, no justification for interfering with Show Me Hospitality's business expectancy.

203.     Indeed, any claim that RSW Group was unfit is belied by the fact that THUSA later asked Sigurdson to reengage RSW Group to reconsider the possibility of becoming a Tim Hortons area developer.

204.     As a direct and proximate cause of THUSA's tortious interference with its business expectancy, Show Me Hospitality lost an ideal and promising partner that had committed to infusing millions of dollars in capital to Show Me Hospitality at a crucial time.

205.     Show Me Hospitality is now without the capital required to move forward with its Development Schedule.

206.     Again, even if Show Me Hospitality were to attract additional investors, Show Me Hospitality has no reason to believe that THUSA will approve them absent a commitment from Show Me Hospitality to enter into the ARA, commit to developing 205 Restaurants over ten years and investing $20,000,000 in capital.

207.     As a direct and proximate result of THUSA's tortious interference with Show Me Hospitality's business expectancy, Show Me Hospitality has been damaged, and continues to be damaged, and is entitled to recover damages.

208.     Show Me Hospitality now seeks a judgment of damages in an amount that will compensate Show Me Hospitality for the actual lost value of the ADA, plus interest thereon and attorneys' fees and costs as permitted under the ADA.  (*See* **Ex. 1**, ADA at § 19.13.)

## VI.   JURY TRIAL DEMAND

209.     Plaintiff demands a trial by jury on all claims and counterclaims made in this matter.

## PRAYER FOR RELIEF

1.      An award of Plaintiff's actual and consequential damages;

2.      An award of Plaintiff's complete costs, disbursements and reasonable attorneys' fees incurred herein, to the extent authorized under contract and applicable law; and

3.      Such other and further relief as the Court deems just and appropriate.


Dated:  July 18, 2017              Respectfully submitted,

                                 **ZARCO EINHORN SALKOWSKI & BRITO, P.A.**
Miami Tower
100 S.E. 2nd Street
27th Floor
Miami, Florida 33131
Telephone: (305) 374-5418
Facsimile: (305) 374-5428

By: s/ Robert M. Einhorn
**ROBERT ZARCO** FL Bar No. 502138
**ROBERT M. EINHORN** FL Bar No. 858188
**ALAINA B. SIMINOVSKY** FL Bar No. 70644

and

**DADY & GARDNER, P.A.**
Scott E. Korzenowski MN #027155X
(*pro hac vice pending*)
Andrew M. Malzahn MN #0397571
(*pro hac vice pending*)
5100 IDS Center, 80 South Eighth Street
Minneapolis, MN  55402
PH:  612-359-9000
sekorzenowski@dadygardner.com
amalzahn@dadygardner.com

***Attorneys for Plaintiff***