**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.: 17-22679-CIV-MARTINEZ/OTAZO-REYES

SHOW ME HOSPITALITY, LLC,

      Plaintiff,

v.

TIM HORTONS USA, INC.,

      Defendant.
_____/

TIM HORTONS USA INC.,

      Counter-Plaintiff,
v.

SHOW ME HOSPITALITY, LLC

      Counter-Defendant,
_____/

SHOW ME HOSPITALITY, LLC

      Third Party Plaintiff,
v.

ERIC D. SIGURDSON,

      Third Party Defendant.
_____/

**DEFENDANT TIM HORTONS USA, INC.'S MOTION FOR SUMMARY JUDGMENT**

Defendant Tim Hortons USA Inc. ("THUSA"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment against Plaintiff Show Me Hospitality, LLC ("Show Me") as to Counts I through III of Plaintiff's First Amended Complaint [DE 46].

## INTRODUCTION

Plaintiff is a former Area Developer and franchisee of the Tim Hortons® System who claims that THUSA anticipatorily breached the parties' Area Development Agreement and Franchise Agreements at a June 28, 2016 meeting, and otherwise breached the parties' agreements. Importantly, Plaintiff's remaining claims[1] legally fail based upon the undisputed facts. THUSA's conduct indisputably did not constitute repudiation nor could Plaintiff assert such a claim given its pre-existing breaches. Moreover, none of Plaintiff's breach of contract claims constitutes actionable breaches.

## UNDISPUTED FACTS

### THUSA

1. THUSA is a Delaware corporation with its principal place of business in Miami-Dade County, Florida, where its franchise operations are conducted and supervised from its headquarters. Athayde decl. at ¶ 4.[2] THUSA is the franchisor of the TIM HORTONS® brand and franchises locations in the United States that are involved in, among other things, the sale of selected foods and beverages, such as coffee, baked goods, sandwiches and related products. *Id.*

2. The Tim Hortons® brand began in Canada and is an iconic quick service system

---

[1] On March 29, 2018, this Court dismissed with prejudice Show Me's claim for tortious interference with business expectancy (Count IV). [DE 37 at 7-8, 12]. Show Me then filed its First Amended Complaint, which again contained the same previously dismissed claim for tortious interference with business expectancy. *See* [DE 46 at 39-42]. Show Me confirmed that it only included the claim for tortious interference in the event that it needed to do so for purposes of appeal. Show Me also included its jury demand for the same reason despite that this Court struck its request for a jury trial. *See* [DE 37 at 8-10].

[2] The declaration of Felipe Athayde, THUSA's former president, is attached as Exhibit "A" (the "Athayde decl.").

that is named after the National Hockey League legend, Tim Horton. *Id*. at ¶ 5. The Tim Hortons® System first began to franchise in the United States in the 1980s by offering franchises mostly in border-states such as New York, Michigan and Ohio. *Id*.; *see also* Sigurdson dep. at 103:11-15.

**Show Me**

3.      Show Me is a Missouri limited liability company 52% owned by Eric Sigurdson. Sigurdson dep. at 17:19-21 and Ex. 2.

4.      On May 30, 2014, after significant negotiations, Show Me entered an Area Development Agreement ("ADA") with THUSA, which provided Show Me with the exclusive right to operate and develop the Tim Hortons® brand in a defined territory designated as the St. Louis Designated Marketing Area (the "St. Louis DMA"). *See* Athayde decl. at Ex. 1 §§ 2.01, 3.01 and Ex. A. Because THUSA was permitting Show Me to exclusively control an important market, Show Me was required to adhere to a development schedule of 40 Tim Hortons® Restaurants in the Initial Term of the first five years. *Id*. at §7.01. Show Me had options to extend its exclusive rights in future years in return for its agreement to open up to 50 restaurants, if it exercised two option terms over the following ten years. *Id*. at §§ 5.03, 7.01. Show Me would lose its right of exclusivity if it failed to adhere to the requisite development schedule. *Id*. at § 7.02.

5.      The development schedule, set forth below, had annual targets that Show Me was required to meet, based upon a mix of restaurant formats.[3]

---

[3] The ADA provided for the development of different types of Restaurants called Standard and Non-Standard-Restaurants. Athayde decl. at Ex. 1 §3.02. "[A] **standard**" Restaurant contains a full product offering, including without limitation, hot and cold coffee and other beverages, baked goods, hot breakfast and soup and sandwich…; is freestanding or located in a mall or food court location with counter service; has dedicated interior seating; dedicated staff and typically includes drive through service." *Id*. "[A] **non-standard**" Restaurant contains a full or limited product offering…; is a cart or a kiosk installed within another facility or institution…, has no dedicated seating or only limited shared or common seating… and typically has no drive through service." *Id*. A product offering limited to beverages only or with a product offering limited to

| Development Year | Number and Type to be Operating at the end of the Development Year |
|---|---|
| 1 (2015) | 7 (at least 2 of which shall be standard Restaurants and no more than 2 of which may be non-standard B Restaurants) |
| 2 (2016) | 15 (at least 3 of the additional Restaurants shall be standard Restaurants and no more than 2 of the additional Restaurants may be non-standard B Restaurants) |
| 3 (2017) | 23 (at least 3 of the additional Restaurants shall be standard Restaurants and no more than 2 of the additional Restaurants may be non-standard B Restaurants) |
| 4 (2018) | 31 (at least 3 of the additional Restaurants shall be standard Restaurants and no more than 2 of the additional Restaurants may be non-standard B Restaurants) |
| 5 (2019) | 40 (at least 4 of the additional Restaurants shall be standard Restaurants and no more than 2 of the additional Restaurants may be non-standard B Restaurants) |

Athayde decl. at ¶ 7.

**The Franchise Locations**

6.     Ultimately, Show Me owned and operated only six TIM HORTONS® franchised locations, pursuant to separate franchise agreements for each location as indicated below:

| TIM HORTONS® Restaurant No. | Address | Date of Franchise Agreement | Type of location |
|---|---|---|---|
| 6033 | 2721 South Big Bend Blvd. Maplewood, Missouri 63143 | 4/23/15 | Standard |
| 6034 | 4249 Clayton Avenue BJC St. Louis, Missouri 63110 | 10/19/15 | Standard |
| 6607 | 450 Regency Park O'Fallon, Illinois 62269 | 8/11/16 | Standard |
| 6193 | 231 North Tucker Boulevard St. Louis, Missouri 63101 | 12/17/15 | Standard |
| 6277 | 10301 Clayton Road Frontenac, Missouri 63131 | 9/9/15 (effective 8/5/15) | Non-Standard A Kiosk |
| 6612 | 1300 Lafayette Avenue St. Louis, Missouri 63104 | 11/23/16 | Standard |

Athayde decl. at ¶ 9.

7.     The Franchise Agreements obligated Show Me to make payments to THUSA for royalties, advertising and other fees. Royalties were to be paid weekly and advertising contributions monthly, each as a percentage of gross sales. Athayde decl. at ¶ 10 and Ex. 2 §§ 4.01, 4.02. Likewise, under the terms of the Franchise Agreements, Show Me was required to

beverages and less than six (6) varieties of baked goods with no seats or no drive through constituted "non-standard B" Restaurants. *Id.*

make payments to THUSA for products, fixtures, furnishings, equipment, décor, signs, supplies, paper goods, services, ingredients, and other items. Athayde decl. at ¶ 11 and Ex. 2 at §5.05(d).

8.    It is undisputed that as of the June 28, 2016 meeting, Show Me was behind in its royalties, ad fund and payments for equipment to THUSA. *Id.* at ¶ 12; Athayde dep. at Ex. 43.

9.    Show Me signed the ADA on May 30, 2014. Athayde decl. at Ex. 1. The first location it opened was in the Scottrade Center in December 2014.  While there were two carts, they counted as one location, despite that THUSA was not legally obligated to count it at all since Show Me never signed a Franchise Agreement for the Scottrade Center (a necessary requirement to count toward the development numbers under the ADA). Athayde decl. at ¶ 13 and Ex. 1 § 7.01. A picture of the kind of cart opened is attached to Mr. Athayde's declaration as Ex. 3. The carts generate significantly lower annual sales then stand alone locations, and at venues such as the Scottrade Center, operate only in conjunction with events. Athayde decl. at ¶ 14. Show Me did not open its first stand alone location, Maplewood, until June of 2015. Sigurdson dep. 139:2-6.

10.    By the end of 2015, Show Me had opened six locations, falling one short of the requisite development schedule.[4] Athayde decl. at ¶ 15. By mid-2016, Show Me knew that it would not meet the requisite target of 15 locations for that year. Tottleben dep. Ex. 7. Show Me's lagging development resulted from a number of factors: unanticipated construction expenses attributable to a unionized work force,[5] difficulties in obtaining local government approvals,[6] disputes between Show Me and THUSA regarding the suitability of proposed locations,[7] and the reluctance of Show Me's partners to contribute more capital[8].  Sigurdson had proposed three

---

[4]  At the end of the 2015 Development Year, Show Me had credit for developing two carts (the most allowed to be developed in a development year), one kiosk and three standard locations.
[5]  Sigurdson dep. at Exs. 30, 35 and 45.
[6]  Sigurdson dep. at 299:12-21 and Ex. 13.
[7]  Show Me submitted to THUSA a package of 3 locations, which were reviewed by THUSA's Real Estate Advisory Committee in December of 2015. THUSA initially rejected the locations finding them to be substandard.  Athayde dec. ¶ 46.
[8]  Sigurdson dep. at Exs. 22 and 23.

locations in 2015, which THUSA originally rejected, because it felt the sites were inferior. Athayde decl. at ¶ 16. Sigurdson prevailed on THUSA's then President for the U.S., Felipe Athayde, asserting that Sigurdson knew the market best. Athayde agreed to reconsider and the sites were approved one month later. *Id.*

11.    After November of 2016, Show Me failed to open any additional Tim Hortons® Restaurants despite having previously requested and receiving approval from THUSA for five additional locations. Athayde decl. at ¶ 17. Specifically, in January 2016, THUSA gave Show Me authorization to move forward with the development of seven locations requested by Show Me. *See* Sigurdson dep. at 120:21-22 and Ex. 13. However, Show Me only opened two of those seven locations, i.e. Tim Hortons® Restaurant #6067 and #6612.

12.    From an early date, it was apparent that Show Me was struggling financially. Sigurdson dep. at 124:4-20; 138:6-13. From 2015 through at least 2017, Show Me required additional cash infusions from its members and bank loans. Sigurdson dep. Exs. 2 and 3. By March 2016, Show Me began to search for other capital sources. At that time-through common attorneys-Sigurdson was introduced to the principal of RSW Group. Tottleben dep. at 26:24-27:7, 158:9-14.[9] RSW Group ("RSW") was a St. Louis based company that had achieved success operating AT&T retail locations. *Id.* at 12:18-13:18.

13.    After meetings over a few months, RSW's principals tentatively agreed to invest capital in Show Me in return for an equity stake in Show Me. Pursuant to an Amended and Restated Operating Agreement, RSW would contribute $2,437,500 to Show Me in return for a 26% stake in Show Me. Sigurdson dep. at 302:5-21 and Ex. 14. This would cause Sigurdson's 52% interest in Show Me to be reduced to 28%. *Id.* at Ex. 14. RSW would also have an option to acquire 10% of Sigurdson's interests, so that RSW Group would have 34% and Sigurdson would have 20%. Sigurdson dep. at 277:12-278:1-7; Tottleben dep. at 76:2-6 and Ex. 5.

---

[9] The principals of the RSW Group are Jeff Tottleben, Brian Nietzel and Bill Cawley. Tottleben dep. at 22:20-23:14.

14.     Sigurdson and RSW recognized that their proposed transaction would require THUSA's consent as well as amendments to material provisions of the ADA. Athayde decl. at ¶ 19. Under the ADA, Show Me was required to assure that Eric Sigurdson controlled at least 51% of Show Me's ownership. Athayde decl. at Ex. 1 §13.02. In fact, these are material terms to the parties' business relationship. Athayde decl. at Ex. 1 §13.02 and Ex. 2 §11.02. The proposed transaction would reduce Sigurdson's stake to 28%, and would transition RSW's Jeff Tottleben to the CEO position within a couple of years. Sigurdson dep. at 211:21-212:3; 310:9-22.

15.     As a result, Show Me requested a meeting with THUSA to introduce THUSA to its potential new partners, and to seek concessions from THUSA regarding the proposed ownership change. Athayde dep. at 316:15-17; Sigurdson dep. at 224:15-225:5. Show Me and RSW expected that THUSA likewise would request concessions from them at the meeting in return for its consent, principally surrounding a more aggressive development schedule that THUSA had earlier proposed to Show Me. Tottleben dep. at 77:20-78:17 and Ex. 6.

16.     THUSA had a new management team as of December 2014 resulting from Restaurant Brand International's acquisition of THUSA at that time. Athayde decl. at ¶ 21. The new team did not believe the development schedule in Show Me's ADA achieved significant market penetration to assure the brand's success in St. Louis. Thus, they had previously proposed a more aggressive development schedule increasing Show Me's commitment to a development schedule of 105 stores over six years. Sigurdson dep. Ex. 17. Show Me and RSW expected that THUSA would negotiate with it by wanting more development in a quicker time period in exchange for THUSA approving the new partners. *Id.*; Tottleben dep. Ex. 6.

17.     The introductory meeting involving RSW took place on June 28, 2016 at Tim Hortons' corporate headquarters in Oakville, Ontario. Sigurdson dep. at 366:14-25. At the time of the meeting, Show Me was behind in its development schedule in 2015 and 2016. Athayde decl. at ¶ 22; Sigurdson dep. at 189;20-23; [DE 46] at ¶ 117. Show Me was also behind in its payments to THUSA totaling more than $250,000. Athayde decl. at ¶ 22; Athayde dep. Ex. 43.

In fact, THUSA's Athayde told Sigurdson he was reluctant to meet due to Show Me's significant debt. Athayde decl. at ¶ 22.

18.     At the June 28, 2016 meeting, THUSA indicated that it would only consider Show Me's proposed management changes, if Show Me considered changes that THUSA wanted, i.e. the entry of an Area Representative Agreement ("ARA") calling for a more aggressive development schedule.[10] Athayde dep. at 355:13-356:1-25. An agreement between the parties was not reached at the meeting on June 28, 2016. *Id.*

19.     In its complaint, Show Me asserts that THUSA repudiated the ADA at the Oakville meeting by pressuring Show Me to get rid of the ADA and enter an ARA which required upfront capital contributions and an accelerated development schedule and then failed to provide support under the ADA. [DE 46 ¶¶ 159, 162-63].

20.     However, THUSA, Show Me and RSW continued to negotiate for months after the meeting. Moreover, both THUSA and Show Me continued to perform under the existing ADA and Franchise Agreements for a year and a half after the meeting. For example, THUSA continued to provide Show Me the critical rights of their business relationship: Show Me continued to operate its restaurants with the benefit of the Tim Hortons® System, including the proprietary marks, the products and the exclusive right to develop Tim Hortons® Restaurants in the St. Louis DMA. Sigurdson dep. at 105:1-106:3, 193:14-194:1. Significantly, it is undisputed -- as even Sigurdson acknowledges -- that THUSA's request that Show Me agree to a more aggressive development schedule was in the context of Show Me's request for amendments to the ADA's ownership requirements. Athayde decl. at ¶ 24.

21.     Negotiations for RSW to join Show Me continued for months after the June 28, 2016 meeting with THUSA's assistance. THUSA's president met with RSW's principals in Dallas and St. Louis in September 2016, and there were frequent communications during that

---

[10]   At the meeting, THUSA requested a commitment to develop 210 locations. Athayde dep. at 448:11-449:3. Within days, as the parties continued to negotiate, THUSA reduced the number to 105 locations over 6 years. Sigurdson dep. Ex. 21.

period of time. In fact, THUSA's president's personal involvement during the months after the June Oakville meeting was at Sigurdson's request. Athayde dep. at 367:14-23, 368:8-13. Despite THUSA and Show Me's repeated efforts with RSW, in late 2016 RSW ultimately stated that it did not want to go forward or submit a request to become a partner in Show Me. Sigurdson dep. Ex. 32; Athayde decl. at ¶ 25. THUSA nevertheless worked with Show Me after that time in an attempt to assist it in finding additional investors. *Id.*

22.     THUSA also continued to provide services to Show Me under the parties' agreements until Show Me abandoned and closed locations. Eric Sigurdson, Show Me's CEO and corporate representative, acknowledged that until Show Me was terminated in December 2017, THUSA continued to provide Show Me with the right to use the Tim Hortons® System and proprietary marks, supplied Show Me with products and supplies, and honored Show Me's territorial exclusivity in the St. Louis DMA. Sigurdson dep. at 105:1-106:3, 193:14-194:1. THUSA also allowed Show Me to open locations *after* the alleged repudiation occurred; signed franchise agreements for those locations and wanted Show Me to open additional locations. Athayde decl. at ¶ 26.

23.     In November 2017, Show Me permanently closed and abandoned two locations. Sigurdson dep. Ex. 48. It was only when this happened that THUSA declared Show Me in default and cross-defaulted Show Me under the Franchise Agreements and ADA, which led to their termination on December 6, 2017.  *See* Sigurdson dep. Exs. 49, 50 and 51.

**Relevant Provisions of the ADA and Franchise Agreements**

24.     Pursuant to Section 19.14 of the ADA, Ohio law applies to the ADA. However, the Franchise Agreements, require the application of Florida law. *See* Compl. at p. 37 n. 10.[11]

25.     Show Me's proposed transaction with RSW implicated important provisions of the agreements. Show Me's ADA with THUSA has important restrictions pertaining to the area

---

[11]  Section 17.05 is not in the Franchise Agreement for TIM HORTONS® Location #6033 but is in the Franchise Agreements for Location #6034, #6193, #6277, #6607 and #6612. Pursuant to Section 17.05, Florida law applies to all Franchise Agreements.

developer's rights to assign its interest in the ADA. Specifically, Section 13.02 provides that:

> **Your rights and obligations under this Agreement are personal because we have entered into this Agreement in reliance on and in consideration of your singular personal trust, confidentiality, skill and qualifications (or, if you are a Business Entity, the personal trust, confidentiality, skill and qualifications of your owners and employees).** Therefore, except as provided below, neither your interest in this Agreement, your rights, privileges or obligations under this Agreement, the Franchised Restaurants, nor any interest in the Franchised Restaurants or Business Entity Franchisee (including capital stock, membership, partnership or proprietary interest of you or anyone who controls you), may be assigned, sold, transferred, shared, reconsidered, sublicensed or divided, voluntarily or involuntarily, directly or indirectly, in one or a series of related transactions, by operation of law or otherwise (each, an "**assignment**") without first obtaining our written consent as provided in this Article 13. Any assignment in violation of this Article 13 will be null, void and of no effect.
>
> Notwithstanding the foregoing, we will not unreasonably withhold our consent to an assignment of this Agreement, **provided that you shall verify sufficiently to us that subsequent to an assignment your principal, Eric Sigurdson, shall retain a controlling interest in or control the majority of the voting rights in assignees and no such assignment shall affect the Guarantee of Eric Sigurdson**.

*See* Athayde decl. Ex. 1 § 13.02 (emphasis added). The Franchise Agreements also have requirements restricting the transfer of interests. *See id.* at Ex. 2 Article XI.

26.     Furthermore, the ADA explicitly states that there are other restrictions on any claims or assertions that THUSA has unreasonably withheld or delayed its consent or approval to a proposed act by Plaintiff under the terms of the ADA. Specifically, Section 19.06 of the ADA applies with respect to the claims that THUSA withheld approval of a transfer of interests to a proposed new partner and withheld approval on real estate packages. The section provides:

> **If you make any claim or assertion that we have unreasonably withheld or delayed any consent or approval to a proposed act by you under the terms of this Agreement, you agree that your sole remedy for the claim will be an action or proceeding to enforce the Agreement provisions, for specific performance or for declaratory judgment…**

*See* Athayde decl. at Ex. 1 § 19.06 (emphasis added). The Franchise Agreements have similar provisions. *See id.* at Ex. 2 § 18.07.

27.     Additionally, Section 19.07 of the ADA includes an integration clause which disavows any prior representations and requires all changes to the ADA to be mutually agreed to in writing, to specify that it is an amendment, and executed by the parties. *See* Athayde decl. at Ex. 1 § 19.07. The Franchise Agreements contain similar provisions. *See id.* at Ex. 2 § 18.02.

28.     The ADA and Franchise Agreements contain non-waiver provisions that provide that any delay in enforcing the breach of any term, covenant or condition of the ADA or Franchise Agreements to exercise any right, option, duty or power arising thereunder will not be construed as a waiver of any preceding or succeeding breach, or any other term, covenant or condition. Athayde decl. at Ex. 1 § 19.03; Ex. 2 § 18.00.

## **MEMORANDUM OF LAW**

### I.     **Summary Judgment Standard**

Summary judgment is warranted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing summary judgment is appropriate, and all facts and inferences from the record must be viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). However, the non-moving party bears the burden of coming forward with evidence of each essential element of its claims or defenses, such that a reasonable jury could return a verdict in that party's favor. In responding to a summary judgment motion, the nonmoving party may not simply rely on its pleadings but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *See Yacht Club on the Intracoastal Condo. Ass'n, Inc. v. Lexington Ins. Co.*, 944 F. Supp. 2d 1258, 1261 (S.D. Fla. 2013) (citations omitted).

## II.      **THUSA Is Entitled to Summary Judgment on Plaintiff's Anticipatory Breach of the ADA Claim**

To establish a claim for anticipatory repudiation under Ohio law, which applies to the ADA, the following standard applies:

> An anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived. To prevail on a claim of anticipatory breach of contract, a plaintiff must establish that there was a contract containing some duty of performance not yet due and, by word or deed, the defendant refused future performance, causing damage to the plaintiff. **However, an anticipatory breach of contract must be an unequivocal repudiation of the contract. A mere request for a change in terms or for cancellation does not constitute a repudiation**. Similarly, a mere expression of doubt as to willingness or ability to perform is insufficient to constitute repudiation of a contract.

*Sunesis Trucking Co., Inc. v. Thistledown Racetrack, L.L.C.*, 22 N.E. 3d 190, 195-96 (Ohio Ct. App. 2014) (emphasis added) Under Ohio law, mere attempts to renegotiate a contract do not constitute anticipatory repudiation. *Id.*

First, Show Me was in breach of its obligations under the agreements at the time of the June 28, 2016 Oakville meeting, and thus, cannot assert a claim for anticipatory repudiation. *See Brakefire, Inc. v. Overbeck*, 878 N.E. 2d 84, 101 (Ohio Ct. App. 2007) (quoting *Waste Mgt., Inc. v. Rice Danis Indus. Corp.,* 257 F.Supp.2d 1076, 1084 (S.D. Ohio 2003) ("Under Ohio law, a non-breaching party to a contract is excused from complying with conditions of the contract, when the party for whose benefit the condition operates has already materially breached the contract.")). It is undisputed that Show Me was delinquent in its financial obligations at the time of that meeting. Athayde decl. at ¶ 22; Athayde dep. Ex. 43.

Show Me alleges that THUSA anticipatorily breached the ADA, when THUSA, through Tim Hortons' then brand President, Elias Dias Sese, stated that Show Me must commit to an ARA with increased development of 205 restaurants over ten years in the St. Louis DMA or THUSA would not support the ADA and would terminate Show Me. [DE 46 at ¶160].

However, THUSA did not terminate their relationship. To the contrary, THUSA

11

continued to perform. Eric Sigurdson, Show Me's CEO and corporate representative, testified that until Show Me was terminated in December 2017, THUSA provided Show Me with the right to use the Tim Hortons® System and proprietary marks and provided Show Me with the exclusive right to develop Tim Hortons® Restaurants in the St. Louis DMA. Sigurdson dep. at 105:1-106:3, 193:14-194:1. THUSA allowed Show Me to open locations *after* the alleged repudiation occurred; signed franchise agreements for those locations and wanted Show Me to open additional locations. Athayde decl. at ¶ 26. Clearly, there was no unequivocal repudiation of the ADA. *See Sunesis Trucking* at 195-96.

To the contrary, the parties continued to perform under the agreements until Show Me abandoned locations in November of 2017. Sigurdson dep. Ex. 48. Show Me alleges that THUSA did not have the right to request a change to the ADA in its consideration of RSW or to withhold consent to the addition of RSW to Show Me. Compl. ¶ 163. However, because the rights under the ADA were personal to Show Me and the ADA was entered in consideration of the personal trust, confidentiality, skill and qualifications of the current owners and employees, assignments required THUSA's consent. Athayde decl. at Ex. 1 § 13.02. And, the provision requiring that THUSA not unreasonably withhold its consent to an assignment did not apply to this purported transaction, because Sigurdson would not retain controlling interest in Show Me. *Id.* The undisputed evidence shows that Sigurdson's interest in Show Me was going to drop from 52% to 28%. Sigurdson dep. at 211:15-212:3. RSW would have 26%. *Id.* at 303:1-8. Additionally, RSW would have an option to acquire 10% of Sigurdson's interests upon exercise and conversion so that RSW Group would have 34% and Sigurdson would have 20%. Tottleben dep. at 76:2-6. Show Me did not fall under the second paragraph of section 13.02 and needed THUSA's consent to the assignment, which decision was THUSA's to make in an unfettered fashion.

Additionally, the June 28, 2016 meeting was indisputably at Show Me's request based upon its own requested concessions from THUSA. Show Me was asking for a material change to

its membership interest that would ultimately result in the phase out of Sigurdson. Sigurdson dep. at 211:21-212:3, 310:9-22. THUSA was within its rights to negotiate terms of the assignment in exchange for changes to the ADA. These undisputed facts clearly do not constitute an unequivocal repudiation of the ADA, as Ohio law is clear that renegotiating a contract does not constitute an anticipatory repudiation. *See Nuco Plastics, Inc. v. Universal Plastics, Inc.*, 601 N.E. 2d 152 (Ohio Ct. App. 1991) (party attempting to unilaterally change contract price did not repudiate contract, but rather was renegotiating contract); *see also Sunesis Trucking Co., Inc.* at 195-96.

Further, even if the facts alleged by Plaintiff do make out a claim for anticipatory repudiation, Plaintiff has not sought available remedies. "If an anticipatory breach of contract is found to occur, the injured party has the option of (1) terminating the contract and suing the breaching party immediately, or (2) continuing the contract and suing the breaching party for damages after the time for performance has passed." *Haman Ents., Inc. v. Sharoer Impressions Painting Co.*, 50 N.E. 3d 924, 931 (Ohio Ct. App. 2015). The undisputed evidence shows that Show Me did not immediately terminate the contract and sue for breach, but rather, purported to continue under the ADA by opening two additional locations in 2016 and exercising its rights to use the THUSA system and proprietary marks. However, under this second option, a party must fully comply with the contract, and the undisputed evidence shows that Show Me failed to do. *See id.* (where party continued to act under the contract but did not fully perform, party did not exercise allowed options for anticipatory repudiation). In this case, Show Me admits that it continued to act under the ADA, but has not complied with its development obligations and payment obligations. Sigurdson dep. at 187:10-18, 189:20-23, 191:7-24. Thus, Plaintiff has not exercised its allowed options for anticipatory repudiation, and THUSA is entitled to summary judgment.

III.  **Summary Judgment is Proper on Plaintiff's Breach of the ADA Claim**

To assert a breach of contract claim in Ohio, a plaintiff must prove "the existence of a

contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (quoting *Jarupan v. Hanna,* 878 N.E. 2d 66, 73 (Ohio Ct. App. 2007) (quotations omitted)). A party breaches a contract if he fails to perform according to the terms of the contract or acts in a manner that is contrary to the contract's provisions. *Id*.

Construction of a written contract is a matter of law to be determined by the court. *DavCo. Acquisition Holding, Inc. v. Wendy's Int'l, Inc.*, No. 2:07-CV-1064, 2008 WL 755283, at *3 (S.D. Ohio Mar. 19, 2008); *Latina v. Woodpath Dev. Co.,* 567 N.E.2d 262, 264 (Ohio 1991). As a general rule, contracts should be construed so as to give effect to the intention of the parties. *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.,* 544 N.E.2d 920, 923 (Ohio 1989). Where the terms of an existing contract are clear and unambiguous, the court "cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract." *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.,* 714 N.E. 2d 898, 901 (Ohio 1999). The court cannot make contracts for others and may not read language or terms into a contract. *Uram v. Uram,* 582 N.E.2d 1060, 1062 (Ohio Ct. App. 1989).

### A.  THUSA Had The Contractual Right to Review Development Proposals in REAC

Show Me alleges that THUSA breached the ADA (1) by failing to respond, timely respond or rejecting development proposals; (2) by failing to provide adequate support after acquisition; (3) failing to take over Show Me's marketing responsibilities; and (4) failing to consider the RSW Group. THUSA is entitled to summary judgment on this claim.

Show Me argues that one of the ways THUSA failed to provide services was by not approving proposals in a manner acceptable to Show Me. Sigurdson dep. at 107:4-16. Section 4.01 of the ADA requires that, prior to entering a franchise agreement, Show Me propose a location and submit to THUSA a real estate package prepared in a form acceptable to THUSA. Athayde decl. at Ex. 1 § 4.01. The real estate packages are submitted to the Tim Horton Real Estate Advisory Committee ("REAC") for approval. Sigurdson dep. at 112:15-16; Athayde dep.

at 49:14-25 through 50:1-2. The ADA is clear that if THUSA failed to provide notice of approval or rejection within 30 days, the location is deemed rejected. Athayde decl. Ex. 1 § 4.01; Sigurdson dep. at 106:4-107:3; 17-20.

Without specifying for which locations, Show Me argues that REAC took too long in reviewing its locations. The undisputed evidence is that REAC meets on a monthly basis and considers all proposed restaurants that are fully ready for review. Athayde dep. at 48:16-24. Show Me also contends that REAC denied three locations in December 2015, but then approved the in January 2016 along with four other locations. However, THUSA continued to believe that the three locations were not up to THUSA standards, but reconsidered them due to Show Me appeals to move forward with the locations. Athayde decl. at ¶ 16. And, the approvals were provided the month after the initial rejection. *Id.* In any event, section 4.01 of the ADA makes plain that Show Me's allegation cannot be a basis for a breach of contract claim, because any package is deemed rejected if not approved or rejected in 30-days. There is no legal duty to support this claim.

Additionally, to the degree Show Me was seeking consent from THUSA for approval to build a Tim Hortons® location, Show Me's breach of contract claim must therefore fail, because under the ADA there can be no claims other than specific performance or declaratory judgment for failing to provide consent to the approval of locations. *Id.* at Ex. 1 § 19.06; *see also Picktown Foods, LLC v. Tim Hortons USA, Inc.*, No. 17-21072-Civ-Altonaga at *21-22 (S.D. Fla. Sept. 11, 2018) (under Ohio law, contract remedy is exclusive if parties so stipulate).[12]

### B.  THUSA did not Orally Modify Marketing Under the Franchise Agreement

Show Me argues that THUSA breached the ADA, because it orally agreed to modify the marketing provision of the ADA. However, a review of section 8.02(c) actually makes plain that the marketing specifications that Show Me believes were orally modified are governed by the Franchise Agreement (and Florida law), not the ADA. Section 8.02(c) states in relevant part that

---

[12] A copy of *Picktown* is attached hereto as Exhibit "B".

THUSA will "as specifically set forth in the Franchise Agreement" return to you up to 75% of the Advertising Contribution paid by Show Me. Athayde decl. at Ex. 1 § 8.02(c). But even if the ADA applies to this argument, the claim fails because modifications to the ADA could only be accomplished by a written amendment to the ADA stating that it was an amendment to the ADA, signed by the parties to the ADA. *Id.* at § 19.07. There was no such amendment to the ADA. Additionally, Show Me failed to show any damages as a result of the alleged oral modification. Bryan dep. at 111:10-14. Thus, even under Ohio law, the claim fails. *See Wells Fargo Bank, N.A. v. Smith*, 2012 WL 1288494, *8 (Ohio Ct. App. Apr. 16, 2012) (on summary judgment, "no oral modification" clause enforced where there was no evidence of damages suffered).[13]

### C.  It is Undisputed That THUSA Considered the RSW Group

Show Me next argues that THUSA failed to consider Show Me's proposed partner, RSW. However, as set forth above, because the proposed assignment did not meet the requirements of the ADA, THUSA had the unfettered discretion to withhold its consent. *See* Athayde decl. Ex. 1 § 13.02. Further, the undisputed facts show that THUSA actively engaged and negotiated with RSW, and that it was RSW that ultimately decided that despite liking THUSA, it was choosing not to move forward. Tottleben dep. at 145:23-146:18 and Ex. 19. The undisputed facts also show that Show Me and RSW had not submitted the proposed assignment to THUSA, had not signed the Amended and Restated Operating Agreement and were not ready, willing and able to move forward with the assignment. Sigurdson dep. at 213:13-22; Tottleben dep. at 164:1-23; Athayde decl. at ¶ 25.

Any claim that THUSA breached the ADA by failing to approve RSW would likewise fail. Plainly, the purported assignment did not meet all the requirements set forth in the ADA, i.e. Eric Sigurdson would not retain controlling interest in or control the majority of the voting rights

---

[13]  As referenced in the next section, under the Franchise Agreements and Florida law, Show Me's oral modification claim also fails.  *See Burger King Corp. v. Hinton*, 203 F. Supp. 2d 1357, 1365 (S.D. Fla. 2002).

in Show Me. Tottleben dep. at 64:9-16; Sigurdson dep. Ex. 14. Nor can Show Me claim damages relating to the proposed RSW transaction. The evidence fails to establish that RSW would have proceeded to invest in Show Me, even had THUSA provided its consent. It is undisputed that RSW still needed to negotiate with its lenders the debt available, and terms, for restaurant expansion. Tottleben dep. at 70:2-24. RSW's Tottleben testified that this was a material -- and undetermined -- condition to the transaction. *Id.* at 70:25 through 71:1-4. Additionally, Tottleben testified that RSW would need concessions from THUSA relating to the existing ADA, specifically an extension or reduction of 2016 development deadlines. *Id* at 164:1-23.

Thus, Show Me has failed to show that it has complied with conditions precedent and was ready, willing and able to move forward with the assignment of interests to RSW Group. Ultimately, the necessary documents were never signed or presented to THUSA. Athayde decl. at ¶ 25. This is fatal to Show Me's breach of the ADA claim, because under Ohio law, before a party may recover for breach of contract, it must prove its own readiness, willingness and ability to perform its part of the contract. *See Thapar v. Biniker*, No. L-82-247, 1982 WL 6708 *3 (Ohio Ct. App. Dec. 30, 1982) (citation omitted); *see also Picktown Foods, LLC v. Tim Hortons USA, Inc.*, Ex. B, slip. op. at *21-22.[14]

### D.  No Breach of the Implied Covenant of Good Faith and Fair Dealing Exists

THUSA is also entitled to summary judgment on the claim that THUSA breached its duty of good faith and fair dealing. As an initial matter, in Ohio, nearly every contract includes an implied good faith and fair dealing requirement. *See Littlejohn v. Parrish*, 839 N.E. 2d 49, 53 (Ohio Ct. App. 2005).

Significantly, however, "[t]he duty of good faith and fair dealing may not be invoked to

---

[14] THUSA is also entitled to summary judgment because THUSA's purported failure to approve the assignment to RSW Group dooms the breach of contract claim.  Under section 19.06 of the ADA there can be no claims other than specific performance or declaratory judgment for failing to provide consent or approval to the assignment of interests in the ADA. Athayde decl. Ex. 1 § 19.06. *See also Picktown Foods, LLC v. Tim Hortons USA, Inc.*, Ex. B, slip. op. at *21-22 (under Ohio law, a contract remedy is exclusive if the parties so stipulate).

override express contract terms." *Wendy's Int'l, Inc.*, 2008 WL 755283 at *6 (citing *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003); *Interstate Gas Supply, Inc. v. Calex Corp.*, 2006 WL 328679 at *20 (Ohio Ct. App. Feb. 14, 2006) (citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 714 N.E. 2d 898, 901 (Ohio 1999) ("There can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself."). The court in *Wendy's* noted that where a written contract is plain and unambiguous -- such as the ones at issue here regarding assignment and real estate proposals -- it is not subject to attack based on standards of good faith and fair dealing merely because its operation will work a hardship on one party and accord advantage to the other. *See Wendy's*, 2008 WL 755283 at *6 (citation omitted). And, to the extent Show Me contends there is an express breach of some requirement to use best efforts to comply with obligations under the ADA, it ignores language in Section 10.5 that belies these allegations and states that the parties "acknowledge that the exercise of any right expressly permitted under this Agreement will be deemed to be exercised in good faith." *See* Sigurdson dep. at 208:8-24. For these reasons as well, THUSA is entitled to summary judgment as to Count II.

## IV.    THUSA is Entitled to Summary Judgment on Plaintiff's Breach of Franchise Agreements Claim

THUSA is also entitled to summary judgment on Show Me's claim for breach of Franchise Agreements. In Count III, Show Me alleges that THUSA breached the Franchise Agreements by not providing general operational support, including when THUSA did not take over marketing in the St. Louis market.[15] Plaintiff also asserts a claim for breach of the implied covenant of good faith and fair dealing. Again, these claims fail.

Show Me claims that THUSA breached a duty under Section 3.03 of the Franchise Agreements to provide "other initial and ongoing advisory assistance to Franchisee concerning the marketing, merchandising, and general business operations of the Franchised Business, as

---

[15]   Show Me is no longer asserting its claims for misappropriating TNAP funds. Sigurdson dep. at 287:14-24.

Franchisor **deems appropriate**." *See* Athayde decl. at Ex. 2 § 3.03 (emphasis added). However, the referenced provision does not obligate THUSA to provide general support to Plaintiff; but rather such support as THUSA "deems appropriate." THUSA retains the sole discretion to determine what services it will provide under this section. *See Burger King Corp. v. Hinton, Inc.,* 203 F. Supp. 2d 1357, 1362 (S.D. Fla. 2002) (as a matter of law, fact that BKC maintained sole reasonable discretion to determine the way in which it provides services in Franchise Agreement, barred franchisee's claim for breach of contract for failure to provide general services).[16] Additionally, under Section 18.08 of the Franchise Agreements, Show Me agreed that THUSA has the right to take actions that may have a favorable or adverse effect on Show Me's interests. *See* Athayde decl. at Ex. 2 § 18.08. Likewise, under this provision, THUSA may exercise its discretion on the basis of its judgment of what is in its own best interest or in the best interests of the System. *Id.*

Additionally, to the extent that Plaintiff alleges that the parties modified the Franchise Agreements marketing provisions by oral agreements, such a claim fails under Florida law due to the non-waiver provisions contained in the parties' Franchise Agreements. *See* Athayde decl. at Ex. 2 § 18.00. It is well-settled under Florida law that "non-waiver" clauses are valid. *See Burger King Corp. v. Hinton*, 203 F. Supp. 2d 1357, 1365 (S.D. Fla. 2002); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1156 (S.D. Fla. 1991); *Philpot v. Bouchelle*, 411 So.2d 1341 (Fla. Dist. Ct. App. 1982); *see also MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 1270 (11th

---

[16] *See also Burger King Corp. v. Austin,* [1990–1992 Transfer Guide] Bus. Franchise Guide (CCH) ¶ 9731 at 21, 774 (S.D. Fla. Nov. 5, 1990) (dismissing breach of contract claim based on allegations concerning management changes where franchise agreement did not explicitly or implicitly permit franchisee to be involved in management affairs)(attached hereto as Ex. "C"); *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1292 (11th Cir. 2001) (affirming grant of summary judgment on breach of contract claim where franchisee alleged company's exercise of discretion was in bad faith; franchisor's decision was not capricious nor in contravention of the parties' reasonable expectations); *Moore v. Palm Coast Cmty. Serv.*, 701 So.2d 115, 116–17 (Fla. Dist. Ct. App. 1997) (affirming trial court's finding that document granting a developing company complete discretion in the implementation of a water drainage project was not ambiguous, as the plain language stated that "the implementation of the program and the extent thereof shall be within the sole discretion of the company").

Cir. 1999).

Despite the provisions in the Franchise Agreements and this case law, Show Me asserts a litany of alleged general shortcomings that it believes THUSA failed to provide to assert some implied obligation to deal in good faith. However, none of these items were covered by the Franchise Agreement or the Franchise Agreements provide to the contrary. Show Me contends there were delays in being provided itemized equipment price lists from THUSA. However, Show Me was not entitled to these price lists under the Franchise Agreements; nevertheless Show Me received all itemized price lists and could show no damages as a result of any purported delays. *See* Sigurdson dep. at 269:6-21. Show Me contends that it did not meet THUSA's support team for months after the closure of the Ohio office, but the franchise agreements contain no such requirement. Show Me also contends that Tim Trac, the system used to track development projects, was antiquated. However, Show Me could show no evidence of how it was damaged by Tim Trac and is not entitled under the Franchise Agreements to a different system. The undisputed facts and caselaw shows that there is no breach of the contract. *See Burger King Corp. v. Hinton*, 203 F. Supp. 2d at 1362 (allegations of breaches of implied contractual provisions fail absent breach of express terms).

Additionally, because there is no express breach of a provision in the Franchise Agreements, there can be no breach of the implied duty of good faith and fair dealing under Florida law applicable to the Franchise Agreements. *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1317-18 (11th Cir. 1999). Thus, THUSA is entitled to summary judgment on Count III.

## CONCLUSION

Based on the foregoing, there is no genuine issue of material fact, and THUSA is entitled to summary judgment as a matter of law.

WHEREFORE, Defendant Tim Hortons USA Inc. requests the entry of summary judgment in its favor, awarding attorney's fees and costs, and such other relief as this Court deems just and proper.

CASE NO.: 17-22679-CIV-MARTINEZ/OTAZO-REYES

## REQUEST FOR HEARING

Pursuant to S.D. Fla. L.R. 7.1.(b)(2), THUSA respectfully requests a hearing on its Motion for Summary Judgment and estimates that thirty (30) minutes would be sufficient for argument. THUSA makes this request due to the Complaint's voluminous nature and the complexity of the issues raised therein regarding the parties' relationship, as well as the interplay of the ADA and Franchise Agreements and the various state laws that apply.

s/Nina Greene
Michael D. Joblove
Florida Bar No.: 354147
mjoblove@gjb-law.com
Nina Greene, Esq.
Florida Bar No. 072079
ngreene@gjb-law.com
Michael Bild
Florida Bar No.: 1003841
GENOVESE JOBLOVE & BATTISTA, P.A.
100 Southeast Second Street, 44th Floor
Miami, Florida  33131
Telephone: (305) 349-2300
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF this 29th day of October, 2018.

**s./ Nina Greene**

Attorney

21

## SERVICE LIST

***Show Me Hospitality, LLC v. Tim Hortons USA, Inc.***
**CASE NO.: 17-22679-CIV-MARTINEZ/OTAZO-REYES**

**(1)** Michael D. Joblove
mjoblove@gjb-law.com
Nina Greene
ngreene@gjb-law.com
Martin J. Keane
mkeane@gjb-law.com
GENOVESE JOBLOVE & BATTISTA, P.A.
4400 Miami Tower
100 Southeast Second Street
Miami, Florida  33131
Telephone:     (305) 349-2300
Facsimile:     (305) 349-2310
*Attorneys for Defendant Tim Hortons USA, Inc.*

**(2)** Robert Zarco
rzarco@zarcolaw.com
Robert M. Einhorn
reinhorn@zarcolaw.com
Alaina B. Siminovsky
asiminovsky@zarcolaw.com
ZARCO EINHORN SALKOWSKI & BRITO, P.A.
One Biscayne Tower
2 South Biscayne Boulevard - 34th Floor
Miami, Florida  33131
Telephone:     (305) 374-5418
Facsimile:     (305) 374-5428
*Attorneys for Plaintiff Show Me Hospitality, LLC*
***SERVED VIA CM/ECF***

**(3)** Scott E. Korzenowski - *Pro Hac Vice*
sekorzenowski@dadygarner.com
Andrew M. Malzahn - *Pro Hac Vice*
amalzahn@dadygarner.com
DADY & GARDNER, P.A.
5100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
*Attorneys for Plaintiff Show Me Hospitality, LLC*
***SERVED VIA CM/ECF***