UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**Case Number:  17-22679-CIV-MARTINEZ/OTAZO-REYES**

SHOW ME HOSPITALITY, LLC,
        Plaintiff/Counter-Defendant,

vs.

TIM HORTONS USA, INC.,
        Defendant/Counter-Plaintiff,

ERIC D. SIGURDSON,
        Third-Party Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** came before the Court for a nine-day nonjury trial.  Plaintiff, Show Me

Hospitality, LLC ("Show Me"), filed an action against its franchisor, Tim Hortons USA, Inc.

("THUSA") for breach of contract and anticipatory breach of contract.  Defendant filed

counterclaims against Show Me and Eric D. Sigurdson ("Sigurdson") for breach of contract and

breach of guarantees, respectively.  The parties each filed their proposed findings of fact and

conclusions of law.  (ECF Nos. 300, 301).  Pursuant to Federal Rule of Civil Procedure 52(a), the

Court's findings of fact and conclusions of law are as follows.

## I.    FINDINGS OF FACT[1]

### A.  The Parties

Plaintiff/Counter-Defendant Show Me Hospitality is a Missouri limited liability company

and franchisee of the Tim Hortons® system.  (Pretrial Stip. at 8 ¶¶ 3–6, ECF No. 194).  Third-

---

[1] Any factual findings that may represent conclusions of law are adopted as conclusions of law
when appropriate.

Party Defendant Eric Sigurdson ("Sigurdson") is the founder and manager of Show Me.  (Pl.'s Ex. 32 at Ex. A; Pretrial Stip. at 8 ¶ 4).  Sigurdson is a citizen of Missouri.  (Pretrial Stip. ¶ 4).

Defendant/Counterclaimant THUSA is the franchisor of the Tim Hortons brand in the United States for franchises that sell selected foods and beverages, such as coffee, baked goods, sandwiches, and related products—including Show Me.  (*Id.* at 8 ¶ 2).  THUSA is a Delaware corporation with its principal place of business in Miami-Dade County, Florida. (*Id.* ¶ 1).

### B.  The Parties' Relationship and Agreements

On May 30, 2014, Show Me and THUSA entered into an Area Development Agreement ("Development Agreement").  (*Id.* ¶ 5; Pl.'s Ex. 34).  The parties also entered into six franchise agreements over the course of over a year ("Franchise Agreements").  (Pl.'s Exs. 75, 129, 134, 149, 258, and 305).  The Franchise Agreements were executed on the following dates: April 23, 2015, September 9, 2015, October 19, 2015, December 17, 2015, and August 11, 2016.  (*Id.*).[2]  In addition, Sigurdson executed the Guarantee, Indemnification, and Acknowledgement agreements ("Guarantee") whereby he personally guaranteed the performance and obligations of Show Me under both the Franchise Agreements and the Development Agreement.  (*See, e.g.*, Pl.'s Ex. 258 at Attach. A; Pl.'s Ex. 34 at Ex. C).

#### 1)  The Area Development Agreement

The Development Agreement granted Show Me the exclusive right and obligation to develop forty Tim Hortons restaurants ("Restaurants")—in different formats, as explained below—in and around St. Louis, Missouri during a five-year period, with the option to develop fifty more restaurants in the next ten-year period.  (Pl.'s Ex. 34 § 7.01; *see* Pretrial Stip. at 8–9 ¶¶ 6–7).  There were two different types of Restaurants that Show Me could develop: Standard vs.

---

[2] The Franchise Agreements are all substantially similar for purposes of this matter.

Non-standard restaurants.  (Pl.'s Ex. 34 § 3.02(B)).  Unless otherwise provided and agreed upon

by THUSA and Show Me, a "Standard" Restaurant is defined as one that

> contains a full product offering, including without limitation, hot and cold coffee and other beverages, baked goods, hot breakfast and soup and sandwich as sold in the majority of other Tim Hortons locations of like kind in the U.S.; is freestanding or located in a mall or food court location with counter service; has dedicated interior seating; dedicated staff and typically includes drive through service.

(*Id.*).  A "Non-Standard" Restaurant, on the other hand, is defined as one that

> contains a full or limited product offering as sold in the majority of other Tim Hortons locations of like kind in the U.S.; is a cart or kiosk installed within another facility or institution such as gas stations and convenience stores, has no dedicated seating or only limited shared or common seating for customers and typically has no drive through service.

(*Id.*).   The Development Agreement further specified four different types of non-standard

Restaurants and grouped them into "Non-Standard A" and "Non-Standard B" Restaurants.  (*Id.*).

"Kiosks" generally fell into the category of Non-Standard A and "carts" within the category of

Non-Standard B.  (*Id.*; *see also* Trial Tr. Vol. 1, ECF No. 282).

Show Me was required under the Development Agreement to adhere to the following

development schedule ("Development Schedule") for the first five-year term of the Initial Term:

| Development Year | Number and Type of Restaurant to be Operating at the End of the Development Year |
|---|---|
| 1 (2015) | 7 (at least 2 of which shall be standard Restaurants and no more than 2 of which may be non-standard B Restaurants) |
| 2 (2016) | 15 (at least 3 of the additional Restaurants shall be standard Restaurants and no more than 2 of the additional Restaurants may be non-standard B Restaurants) |
| 3 (2017) | 23 (at least 3 of the additional Restaurants shall be standard Restaurants and no more than 2 of the additional Restaurants may be non-standard B Restaurants) |
| 4 (2018) | 31 (at least 3 of the additional Restaurants shall be standard Restaurants and no more than 2 of the additional Restaurants may be non-standard B Restaurants) |
| 5 (2019) | 40 (at least 4 of the additional Restaurants shall be standard Restaurants and no more than 2 of the additional Restaurants may be non-standard B Restaurants) |

(Pl.'s Ex. 34 § 7.01; Pretrial Stip. at 9 ¶ 7).   The date upon which the parties would determine whether Show Me was operating the required number of Restaurants in each development year was December 31 of each calendar year.  (Pretrial Stip. at 9 ¶ 9; Pl.'s Ex. 34 § 7.01).

If Show Me failed to adhere to the Development Schedule by failing to open or continue to operate the required number of Restaurants in each of the development years, it would be in material breach of the Development Agreement, unless Show Me cured the breach as provided in Section 16.03.  (Pl.'s Ex. 34 § 7.02).  But if such failure was "due to an act or omission on [THUSA's] part which materially adversely affect[ed] [Show Me's] ability to adhere to the Development Schedule[,]" the failure to adhere to the Development Schedule would not constitute a material breach.  (Pl.'s Ex. 34 § 7.02).  Show Me's rights to cure depended in part on how far it was behind schedule.  (*See* Pl.'s Ex. 34 § 16.03).  The Development Agreement provided the following cure requirements depending on how far Show Me was behind schedule:

    (i)     if Show Me was one Restaurant behind schedule, THUSA could require Show Me to pay an additional fee of 25% of the Franchise Fee per Restaurant not developed;

    (ii)    if Show Me was two Restaurants behind schedule, THUSA could require the remedy set forth in (i) or the ability to terminate Show Me's territorial exclusivity; and

    (iii)   if Show Me was three Restaurants behind schedule, THUSA could require the remedies set forth in (i) and (ii) or the ability to terminate the Development Agreement effective upon 60 days' notice.

(*Id.* § 7.02).

In addition, pursuant to Section 13.02 of the Development Agreement, Show Me was precluded from transferring any ownership interest in Show Me that would reduce Sigurdson's ownership interest to below a controlling interest, without first obtaining THUSA's written consent.  The provision expressly states that the agreement was entered into "in reliance on and in consideration of [Show Me's] personal trust, confidentiality, skill and qualifications" or that of its

owners and employees, in this case, Sigurdson.  (Pl.'s Ex. 34 § 13.02).

On the other hand, the Development Agreement also imposed upon THUSA that it could not "unreasonably withhold [] consent to an assignment of this Agreement, provided that [Show Me] shall verify sufficiently to [THUSA] that subsequent to an assignment, [Sigurdson] shall retain a controlling interest in or control the majority of the voting rights" and that no such assignment shall affect the Guarantee of Sigurdson.  (*Id.*).  By signing the Guarantee, Sigurdson warranted that he controlled at least 52% of Show Me's voting rights and that he would not sell or transfer his interest in Show Me during the term of the Development Agreement, without first obtaining THUSA's consent.  (Pl.'s Ex. 258 at Attach. A ¶ 10).

Finally, pursuant to the Development Agreement, the prevailing party in a dispute between the parties is entitled to recover from the other party reasonable attorneys' fees, experts' fees, court costs, and all other expenses of litigation in any action.  (Pl.'s Ex. 34 § 19.13).

### 2) *The Franchise Agreements*

In addition to the Development Agreement, the parties signed six Franchise Agreements which contain specifications regarding the right to operate the specific locations, payment obligations, and other issues particular to individual Restaurants.  (*See* Pl.'s Exs. 75, 129, 134, 149, 258, and 305).  Under the Franchise Agreements, Show Me was obligated to make payments to THUSA for royalties, advertising, and other fees.  Specifically, Show Me was required to pay THUSA a weekly royalty fee of 1%, 3%, or 6% of the weekly gross sales—depending on the gross sales each week—for the first 104 weeks after the opening date of the franchise.  (Pl.'s Ex. 258 § 4.01).  After the first 104 weeks, the royalty fee reverted to 6% of the weekly gross sales.

Show Me was also required to pay THUSA 4% of its monthly gross sales for the preceding calendar month in return for advertising, sales promotion, and public relations expenditures made

by THUSA on behalf of the entire Tim Hortons® system, through the Tim's National Advertising Program, Inc. ("TNAP").  (*Id.* § 8.00).  During the Initial Term, THUSA was required to refund Show Me 75% of the 4% advertising contribution Show Me actually paid to THUSA for advertising and promotion, to be placed by Show Me in the Development Territory.  (*Id.*).  As the franchisor, THUSA had "the right, but not the obligation, to establish, maintain, and administer TNAP or another System advertising fund."  (*Id.* § 8.02 (emphasis added)).  While THUSA had discretion in managing TNAP and allocating funds, it was required to act "with reasonable discretion."  (*See id.* § 8.02(b)).  THUSA, however, was "not obligated, in administering TNAP, to make expenditures for [Show Me] which are the equivalent or proportionate to [Show Me]'s contributions, or to ensure that [Show Me] benefits directly or <u>pro rata</u> from expenditures by TNAP."  (*Id.* (emphasis in original)).

As to Show Me's right to transfer its interest, the Franchise Agreements have similar requirements as those in the Development Agreement restricting the transfer of interests without THUSA's prior approval.  (*Id.* § 11.01).  The Franchise Agreements acknowledge that the rights thereunder are personal to Show Me and Sigurdson.  (*Id.*).

Finally, the Franchise Agreements provide, in pertinent part, that the following constitute material breaches subject to termination without an opportunity to cure:

> a.  If Franchisee at any time ceases to operate or otherwise abandons the Franchised Business for five consecutive days without justification, or for any reason whatsoever loses the right to possession of the Franchised Business Premises or otherwise forfeits the right to do or transact business in the jurisdiction where the premises of the Franchised Business is located;
>
> . . .
>
> i.  If Franchisee loses, for any reason whatsoever, any license required with respect to the operation of the Franchised Business and such license is not reinstated within 3 days after such loss;

. . .

u. If Franchisee or any affiliate of Franchisee commits an act of default under any other agreement with Franchisor or any of Franchisor's affiliates for such agreement is terminated; . . .

(Franchise Agreements, § 12.01(a), (i), (u)).  Upon the occurrence of the aforementioned events, THUSA had the option, but was not required, to terminate the Franchise Agreements and all rights granted therein.  (*Id.* § 12.01).  THUSA was nevertheless required to provide Show Me with notice of default and termination.  (*Id.*).

### C.  Show Me's Development Obligations

Throughout the parties' relationship, THUSA approved a total of fourteen locations, only half of which were opened by Show Me. (*See* Trial Tr. Vol. 3 at 100:13–15, ECF No. 284; Pretrial Stip. at 9 ¶ 10, 11 ¶¶ 11, 13; Pl.'s Ex. 158).  Show Me began with the operation of two carts in St. Louis's Scottrade Center hockey arena in October 2014.  (Pretrial Stip. at 10 ¶¶ 11-12; Trial Tr. Vol. 6 at 17:25–19:7, ECF No. 287; Trial Tr. Vol. 12 at 19:14–20, ECF No. 293).  These were considered Non-Standard B carts under the Development Agreement.  (Pretrial Stip. at 10 ¶ 11).  Show Me did not open its first actual stand-alone restaurant—a Standard Restaurant—until June 2015, at a location known as "Maplewood" (Store No. 6033). (Pretrial Stip. at 10 ¶ 17; *see* Trial Tr. Vol. 5 at 21:13–15, 55:19–22, ECF No. 286).  Then, in August 2015, Show Me opened a Non-Standard A Kiosk known as "Frotenac" (Store No. 6277), (Pretrial Stip. at 11 ¶ 18; Trial Tr. Vol. 5 at 55:23–25), and a Non-Standard B Cart known as "Edward Jones Dome" (Store No. 6563), (Pretrial Stip. at 11 ¶ 18, Trial Tr. Vol. 5 at 56:1–4).  Later that year, despite some delays, Show Me opened its second and third Standard Restaurants known as BJC Cortex" (Store No. 6034) and Park Pacific (Store No. 6193) in October 2015 and December 2015, respectively.  (Pretrial Stip. at 11 ¶ 18; 56:5–18; Trial Tr. Vol. 5 at 56:5–57:2; *see also* Def.'s Ex. 602).

The delays in openings continued, and in fact worsened in 2016.  After a four-month delay, Show Me opened another Standard Restaurant known as "O'Fallon" (Store No. 6607) in August 2016.  (Pretrial Stip. at 12 ¶ 25; Trial Tr. Vol. 5 at 58:4–15; *see also* Def.'s Ex. 602).  Then, after a seven-month delay, in December 2016, Show Me opened its final Standard Restaurant, known as "Lafayette" (Store No. 6612).  (Pretrial Stip. at 12 ¶ 27; Trial Tr. Vol. 5 at 58:16–18; *see also* Def.'s Ex. 602).  Show Me never opened the other locations THUSA approved in 2016 because it did not have the capital to do so.  (*See* Trial Tr. Vol. 4 at 5:7–11, ECF No. 285).

Notwithstanding these openings, Show Me did not meet the Development Schedule set out in Section 7.01 of the Development Agreement.   In 2015, Show Me failed to meet its obligations because, although it opened a total of seven Restaurants, it opened three Non-Standard B carts, where the Development Agreement called for a maximum of two Non-Standard B Restaurants. (*See* Pretrial Stip. at 10–11 ¶ 18).  Because the third Non-Standard B Restaurant did not count towards its development obligations, Show Me was one Restaurant short in 2015.  (Trial Tr. Vol. 5 at 40:8–11; *cf.* Pl.'s Ex. 143 at 2).  By the end of 2016, Show Me was four Restaurants short of the development requirement.  (Trial Tr. Vol. 5 at 51:15–20).  In 2017, Show Me did not open any new Restaurants, (*Id.* at 51:21–23), so by the end of 2017, Show Me was fifteen Restaurants short of its obligations, (*id.* at 52:7–9).

### D.  Show Me's Financial Deficiencies

Since the beginning of Show Me's operations, Show Me had unexpected capital shortfalls and other needs when opening its Restaurants.  (*See* Trial Tr. Vol. 5 at 73:8–13).  Sigurdson underestimated the business's capital needs in his initial $3 million capital raise,[3] as the company

---

[3] The initial capital raise of $3 million was from 11 members. Sigurdson, as the 52% owner and managing member contributed no capital. (Pl.'s Ex. 32 at Ex. A).

incurred greater startup costs than he expected. (Trial Tr. Vol. 5 at 74:14–75:10; Pl.'s Ex. 143 at 5; *see* Trial Tr. Vol. 5 at 76:22–78:4). Sigurdson acknowledged that the construction costs for its first couple of Standard Restaurants were "egregiously" higher than what he had anticipated— about 30 to 40% higher. (Trial Tr. Vol. 5 at 73:14–74:13). Sigurdson informed his partners that the first eighteen months of the development project had been "more complicated, taken more time, and cost considerably more than anticipated," all of which, according to him, was "exacerbated" by changes in ownership at THUSA.[4] (Pl.'s Ex. 143 at SMH10225).[5] Moreover, land in the St. Louis market was more expensive than Sigurdson anticipated. (Trial Tr. Vol. 5 at 75:5–7). By November 2015, five months after the opening of Maplewood, the first Standard Restaurant, Sigurdson sought additional funds from his partners. (Pl.'s Ex. 143 at SMH10229). Sigurdson complained to his partners about the unanticipated expenses in the St. Louis market, including, as mentioned, the high cost of land, building costs that were 1.5 times higher than in other Tim Horton's markets, and the high construction cost of union labor. (Trial Tr. Vol. 5 at 73:14–74:13; Pl.'s Ex. 143).

Due to these higher unanticipated expenses, Sigurdson had to increase his target annual sales assessment for stand-alone locations to at least $1.5 million annually. (*Id.* at 77:22–78:10). But he was not meeting this goal within the first couple of years. Indeed, Show Me's strongest stand-alone Restaurant, Maplewood, was generating about $300,000 below the $1.5 million break-even point. (*Id.* at 78:11–22). Likewise, BCJ Cortex was generating approximately $700,000 less than Show Me's projected break-even point. (*Id.* at 78:23–79:3).

As a result, Sigurdson sought out more investors. In March 2016, Sigurdson met Jeff

---

[4] These changes are more thoroughly explained *infra* in Section I(C).
[5] For ease of reference, the Court will cite to the bates number on exhibits that contain this pagination format.

Tottleben, whom along with Bill Cawley and Brian Nietzel owned RSW Group ("RSW").  (Pretrial Stip. at 11 ¶ 19).  After several months of negotiation, by June 17, 2016, Show Me and RSW came to terms on a draft Amended and Restated Operating Agreement in which RSW pledged $2.43 million in exchange for 26% ownership in Show Me.  (*Id.*).  This would cause Sigurdson's 52% interest in Show Me to be reduced to 28%.  (*Id.*).  RSW would also have the option to acquire 8% of Sigurdson's interests, leaving Sigurdson with only 20% ownership in Show Me.  (*Id.*).

### E.  Restaurant Brands International's Acquisition of THUSA

On December 16, 2014, Burger King Worldwide, Inc., a subsidiary of Restaurant Brands International ("RBI"), and 3G Capital acquired THUSA.  (Pretrial Stip. at 10 ¶ 14).  Upon RBI's acquisition of THUSA, THUSA appointed Felipe Athayde ("Athayde") as Vice President of Development and Elias Diaz Sese ("Diaz Sese") as Tim Hortons Global President.  (*Id.* ¶ 15).   In addition to THUSA's management, RBI also made changes to THUSA's operations.   In January 2015, Tim Hortons global—including THUSA—laid off approximately 350 employees, including administrative, accounting, finance, and human resources staff, some of which Show Me had been working with.  (Trial Tr. Vol. 2 at 26:6–14, ECF No. 283).  In May 2015, THUSA closed its headquarters in Dublin, Ohio (the "Dublin Office") and relocated operations outside of the United States, to Oakville, Ontario.  (*Id.* at 36:16–20; Trial Tr. Vol. 9 at 12:23–26, ECF No. 290).  This also resulted in a further loss of employees, including THUSA's head of franchising, John Golaszewski, THUSA's senior director of U.S. development, Jeff Baldwin, and several other employees on the THUSA development staff Show Me had been working with since May 30, 2014.  (Trial Tr. Vol. 2 at 36:20–24).  Sigurdson testified that THUSA never notified him that the individuals he had been working with had been laid off.  (*Id.* at 38:24–39:5).

These changes were the result of Tim Horton's new business model, by which site selection

and construction would no longer be performed by the franchisor, and instead would be performed by the franchisees, thus eliminating the need for architects, engineers, contractors, and other THUSA's staff historically at the Dublin Office.  (Trial Tr. Vol. 9 at 15:4–16:12).  In THUSA's view, the U.S. locations were better managed from a centralized office near Toronto, where Tim Horton's international operations are based, and which was only within a one-hour flight of Tim Horton's largest U.S. markets.  (*Id.* at 3:1–19, 14:2–8).  Importantly, there is no requirement under either the Development Agreement or the Franchise Agreements that THUSA maintain its headquarters in Ohio.

RBI also had a different vision for the development and growth of the Tim Hortons brand in St. Louis.  The new management at THUSA did not believe that the development schedule set out in the Development Agreement achieved significant market penetration to assure the brand's success in St. Louis, Missouri.  (*Id.* at 25:7–29:6).  The new management believed that market success was best achieved by a ratio of one location per 30,000 residents. (*See id.*).

On April 3, 2015, Diaz Sese and Athayde visited St. Louis to meet with Sigurdson.  (Pretrial Stip. at 11 ¶ 16).  At the meeting, Diaz Sese and Athayde conveyed that they respected the existing Development Agreement, but presented a new, more aggressive development model under what it called an area representative agreement ("ARA").  (Trial Tr. Vol. 5 at 19:21–24; *see* Trial Tr. Vol. 9 at 21:6–9).  This accelerated development model would increase Show Me's commitment to a development schedule of 105 stores over the course of six years.  (Trial Tr. Vol. 9 at 80:1–7; *see also* Pl.'s Ex. 239).  Under this model, however, Show Me could source its development obligations to third-party franchisees that would open their own restaurants with their capital under Sigurdson's leadership.  (Trial Tr. Vol. 9 at 21:18–22:4).  At the time it was presented to him for the first time, Sigurdson did not reject the ARA idea, but instead expressed that he needed to

discuss with his partners.  (Trial Tr. Vol. 5 at 19:25–21:4).  The ARA was "pitched" to Show Me

again in June 2015.  (Pl.'s Ex. 143 at 5; *see* Trial Tr. Vol. 2 at 34:24–3).

### F.  The June 28, 2016 Meeting

On June 28, 2016, Show Me met with THUSA's executives at THUSA's then-headquarters

in Oakville, Ontario introduce the RSW representatives to them (the "Meeting").  (Pretrial Stip. at

11 at ¶ 22).  The parties' business relationship around the time of the Meeting was "very tense"

and struggling given Show Me's failure to pay approximately $250,000 owed to THUSA at the

time and its development deficiencies.  (Trial Tr. Vol. 9 at 35:13–24; Trial Tr. Vol. 10 at 24:9–17,

ECF No. 291).  Nevertheless, Diaz Sese, Tim Horton's then-president, attended the Meeting and

THUSA's entire senior management team was present.  (Trial Tr. Vol. 10 at 24:18–24, 25:11–19).

On Show Me's end, Sigurdson brought Tottleben and Cawley to the meeting and they spoke of

their capabilities as partner.  (*See* Trial Tr. Vol. 3 at 79:1–20).

According to Sigurdson, Diaz Sese stated at the Meeting that THUSA would only consider

Show Me's proposed management changes if Show Me considered the ARA.  (Trial Tr. Vol. 10

at 26:25–27:6).  Paul Mayer, an investor and owner of Show Me, was also present at the Meeting

and testified that Diaz Sese stated at the Meeting that unless Show Me agreed to enter into an

ARA, THUSA would not consider RSW as a partner.  (Trial Tr. Vol. 6 at 162:3–5).  Diaz Sese

denies having conditioned THUSA's approval of the new partner on Show Me's acceptance of the

ARA.  (Trial Tr. Vol. 10 at 26:25–27:12).  The Court finds Sigurdson's and Mayer's testimony on

this issue credible.

Sigurdson further testified that Diaz Sese told him, "if you don't do that, you're going to

be back here and you're done."  (Trial Tr. Vol. 3 at 80:10–16).  In other words, Sigurdson maintains

that Diaz Sese told him that if he did not enter into an ARA, he would be "done."  Show Me,

however, presented no other testimony to confirm that Diaz Sese made this statement.  On the other hand, Diaz Sese denied having threatened to end the Development Agreement if Show Me did not enter into an ARA.  (Trial Tr. Vol. 10 at 27:7–12).  Athayde also testified that no one from Tim Hortons threatened to terminate the business relationship during the Meeting, and that the relationship was not terminated then.  (Trial Tr. Vol. 9 at 40:12–19).  The Court credits Diaz Sese's and Athayde's testimony that Diaz Sese did not end or threaten to end the Development Agreement at the Meeting.

Despite Diaz Sese's comments, the parties continued to negotiate for months after the Meeting.  (Trial Tr. Vol 5 at 45:7–19).  A few days after the Meeting, Sigurdson sent a letter to Diaz Sese and Athayde expressing Show Me's desire to discuss in detail the existing and proposed new partners and the development plan "going forward."  (Pl.'s Ex. 239).  Sigurdson specifically stated that Show Me "desire[d] to continue to move forward with the aggressive development plan of [its] St. Louis market" and that it wished to move forward with the ARA.  (*Id.*).  But Sigurdson explained in that letter that, to do so, Show Me had presented THUSA with the potential partnership of RSW, who wished to invest significant capital.  (*Id.*).  Moreover, the letter stated that while Show Me had endured significant challenges working through THUSA's transformation after RBI's acquisition, Show Me was "pleased with the positive new direction" and it trusted THUSA as Show Me's partners.  (*Id.*).  Later that year, in September 2016, Athayde met with RSW's principals in Dallas and St. Louis and there were frequent communications throughout that period of time. (Trial Tr. Vol. 9 at 50:13–51:2; Trial Tr. Vol. 10 at 22:1–29:7; Pretrial Stip. at 12 ¶ 26).  These conversations continued until at least February 2017.  (Pl.'s Ex. 313).  It was Tottleben, however, who determined not to move forward with the partnership with Show Me.  (Trial Tr. Vol. 9 at 53:16–19).  In addition, after the Meeting, THUSA worked with Show Me to

13

find other potential investors, aside from RSW.  (Trial Tr. Vol. 10 at 30:7–32:12).

After the Meeting took place, the parties also continued performing their obligations under the Agreements through December 2017, when Show Me closed its remaining locations.  In 2016, Show Me opened two new locations, (*Id.* at 42:11–13), and THUSA continued providing development assistance to Show Me.  (*See* Trial Tr. Vol. 9 at 34:9–10; 41:4–8).  Show Me continued to be the exclusive operator of Tim Hortons franchises in the market at the time.  (Trial Tr. Vol. 5 at 42:18–20).

### G.  Show Me Closes its Restaurants

Ultimately, Show Me closed its Restaurants because it could no longer sustain the development and operations of Restaurants.  In May of 2017, Show Me removed the two carts it had in the Scottrade Center.  (Trial Tr. Vol 4 at 6:4–17).  Later that year, on November 24, 2017, Show Me permanently closed BJC Cortex and Park Pacific.  (*Id.* at 7:5–9; Pl.'s Ex. 321).  Show me notified THUSA of the closure of BJC Cortex and Park Pacific on the same day.  (Pl.'s Ex. 321).  Then, a month later, on December 24, 2017, Shoe Me closed the remaining locations— O'Fallon, Maplewood, Frotenac, and Lafayette.  (Trial Tr. Vol. 4 at 12:16–22).  Show Me notified THUSA of the permanent closure of these locations on December 26, 2017.  (*Id.* at 12:23–13:3; Pl.'s Ex. 327).

On December 6, 2017, even before the closure of the last locations, THUSA sent Show Me and Sigurdson a Notice of Default of the Development Agreement.  (Trial Tr. Vol. 4 at 8:2–10; Pl.'s Ex. 322).  This notice of default stated in pertinent part that, as of the date of the notice, Show Me and Sigurdson owed THUSA for "certain past due fees, including, but not limited to, opening fees and other amounts for the Restaurants under the [Development Agreement] totaling $284,003.00." (Pl.'s Ex. 322 at 1).  The notice also stated that Show Me and Sigurdson "failed to

adhere to the requisite Development Schedule set out in Section 7.01 of the Development Agreement, which constitutes an additional default under the [Development Agreement]." (*Id.*). The Notice further provided Show Me with thirty days from receipt of said Notice to cure the defaults. This was the first and only notice of default that Show Me received from THUSA. (Trial. Tr. Vol. 4 at 8:19–21).

On the same date that THUSA sent this notice of default, it also sent Show Me and Sigurdson Notices of Incurable Default of Franchise Agreements and Confirmation of Termination. (Pl.'s Exs. 323, 324, 325). All these notices referenced Show Me's correspondence dated November 24, 2017 in which Show Me advised THUSA that it had "'permanently closed' and therefore ceased the operation of the Franchised Business[es] . . . for at least five consecutive days without justification." (*Id.* at 1–2). As to these BJC Cortex and Park Pacific, the notice stated that, "[p]ursuant to Section 12.01(a) of the THUSA Franchise Agreements, this [closure] constitutes an event of default without an opportunity to cure." (Pl.'s Exs. 324 at 1–2). As to O'Fallon, Maplewood, Frotenac, and Lafayette, which had not been yet closed, the notices explained that "pursuant to the cross-default provision in Section 12.01(u) of the THUSA Franchise Agreement, [the closure of BJC Cortex and Park Pacific] constitutes an event of default without an opportunity to cure[.]" (Pl.'s Exs. 323, 325).

The notices of default of the Franchise Agreements also stated other reasons why Show Me was in default. For instance, as to the Missouri locations (Store Nos. 6033, 6277, and 6612), the letter stated that Show Me "failed to maintain a sales tax license with the Missouri Department of Revenue since June 2, 2017, which constitutes additional events of default without opportunity to cure" pursuant to Section 12.01(i) of the Franchise Agreements. (Pl.'s Ex. 325 at 2). Sigurdson admitted during his testimony at trial that as early as June 2016, he was delinquent in sales tax

payments to taxing authorities.  (Trial Tr. Vol. 5 at 40:12–41:18).  As to BJC Cortex and Park Pacific, the notice further notified Show Me that it had violated Section 12.02 of the Franchise Agreements because a judgment in the amount of $849,040.58 was entered against Show Me and Sigurdson on October 27, 2017 and in favor of a creditor bank in state court in Missouri.

After closing its Restaurants, Show Me owed THUSA a total of $662,653.00. (Def.'s Ex. 593; Trial Tr. Vol. 13 at 48:6–49:3, ECF No. 294).  This includes monies due pursuant to the Agreements, as well fees for not sufficient funds ("NSF").[6]

## II.    CONCLUSIONS OF LAW

### A.  Applicable Law

As a preliminary matter, the parties agree that the law governing any claim or controversy arising from the Development Agreement is Ohio law.  (Pretrial Stip. at 20; Pl.'s Ex. 34 § 19.14).  As to the Franchise Agreements, the parties agree that any claim or controversy arising from these agreements is governed by Florida law.  (Pretrial Stip. at 20; Pl.'s Ex. 258 § 17.00).  Finally, the parties agree, and the Court holds, that it has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  (Pretrial Stip. at 20; First Am. Compl. ("FAC") ¶ 19, ECF No. 46).

### B.  Show Me's Claims

Show Me brings four claims against THUSA: (1) anticipatory breach of the Development Agreement; (2) breach of the Development Agreement and breach of the covenant of good faith and fair dealing; and (3) breach of the Franchise Agreements.[7]  Show Me bears the burden of proving its claims by a preponderance of the evidence.  The Court turns to each count below.

---

[6] NSF's are fees charged by banks for payments that were either stopped or deemed insufficient by the bank.  (Trial Tr. Vol. 13 at 24:15–25:1).

[7] Show Me's claim for tortious interference was previously dismissed with prejudice.  (*See* ECF No. 37 at 7–8).

1) *Anticipatory Breach of the Development Agreement*

Show Me alleges that THUSA anticipatorily breached the Development Agreement (Count I) by repudiating the agreement at the June 28, 2016 Oakville, Ontario meeting.   To establish a claim for anticipatory repudiation under Ohio law, Show Me must establish that "there was a contract containing some duty of performance not yet due, and that by word or deed, the defendant refused future performance, causing damage to the plaintiff."  *Sunesis Trucking Co., Inc. v. Thistledown Racetrack, L.L.C.*, 2014-Ohio-3333, 22 N.E.3d 190, ¶ 30 (8th Dist.) (citing *Metz v. Am. Elec. Power Co., Inc.*, 2007-Ohio-3520, 877 N.E.2d 316, ¶ 35 (10th Dist.)).   An anticipatory breach of a contract, however, must be an unequivocal repudiation of the contract. *Sunesis Trucking*, 22 N.E.3d 190, ¶ 31.  "A mere request for a change in terms or for cancellation does not constitute a repudiation."  *Id.*  Similarly, an expression of doubt as to the willingness or ability to perform is insufficient to constitute repudiation.  *Id.*  If anticipatory breach of a contract is found to occur, the injured party has two options: (1) terminate the contract and sue the breaching party immediately, or (2) continue the contract and sue the breaching party for damages after the time for performance has passed.  *Id.* ¶ 33.

The parties do not dispute that there is a contract between them, the Development Agreement, yet they differ on whether THUSA repudiated the Development Agreement at the Meeting.  Show Me argues that THUSA anticipatorily breached the Development Agreement via Diaz Sese at the June 28, 2016 Meeting.  At this Meeting, Sigurdson introduced RSW to THUSA as potential new partners and explained the role they would have in Show Me if they were approved by THUSA.  (Trial Tr. Vol. 3 at 78:5–16).  Both Tottleben and Cawley spoke about their capabilities as partners.  (*See id.* at 79:1–20).  Sigurdson claims that Diaz Sese's purported statement, "if you don't do the deal, you're to be back here and you're done" . . . , (*id.* at 80:15–

16), constitutes a repudiation of the Development Agreement.

This statement, however, does not amount to a "clear and unequivocal" manifestation of intent to repudiate, or, in other words, of its intention not to perform its obligations in the future. *See McDonald v. Bedford Datsun*, 570 N.E.2d 299, 301 (8th Dist.); *Haman Ents., Inc. v. Sharper Impressions Painting Co.*, 2015-Ohio-4967, 50 N.E.3d 924 ¶ 23 (10th Dist.).  Neither Diaz Sese nor any of the THUSA executives present at the Meeting say that they would not continue performing their obligations under the agreements if Show Me did not enter into an ARA.  The statements made by Diaz Sese at the Meeting were, at best, requests for modification of Development Agreement.  *See Sunesis Trucking*, 22 N.E.3d 190, ¶ 31.

Indeed, after the Meeting, the parties continued with "business as usual."  Not only did they continue negotiating the possibility of entering into both the ARA and the RSW deal, (*see* Pl.'s Ex. 239; Pl.'s Ex. 279), but they also continued performing their obligations under Development Agreement, (*see* Pl.'s Ex. 257).  THUSA executives met with Sigurdson and RSW in October and September 2016, months after the Meeting.  (Pl.'s Ex. 279 ("Tim Hortons met on September 12th with Jeff and two of his managers in the morning, with Tina, Don Musick and [Sigurdson] joining for the afternoon.  Jeff, Bill and Brian are meeting in Dallas with Tim Hortons [on] September 28th."); Pl.'s Ex. 293 at 1).  Show Me continued to be the exclusive operator of Tim Hortons franchises in the market at the time.  (Trial Tr. Vol. 5 at 42:18–20).  Show Me also continued performing its development obligations under the Development Agreement by opening two new locations.  (*Id.* at 42:11–13). The fact that Show Me itself may have failed to propose new locations after the Meeting is not indicative of THUSA's performance given Show Me's challenged financial condition up to that point.  THUSA, on the other hand, continued providing development assistance to Show Me after the Meeting.  (*See* Trial Tr. Vol. 9 at 34:9–10; 41:4–8).

For these reasons, the Court finds that no anticipatory breach occurred and THUSA is entitled to judgment in its favor on Count I of the First Amended Complaint.

> 2) *Breach of the Agreements and the Implied Covenant of Good Faith and Fair Dealing*

Show Me also brings claims for breach of the Development Agreement, the Franchise Agreements, and the implied covenant of good faith and fair dealing (Counts II and III).

> i. <u>Breach of the Development Agreement and the Implied Covenant of Good Faith and Fair Dealing</u>

Under Ohio Law, which governs the Development Agreement, to establish a claim for breach of contract, a plaintiff must demonstrate (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) and that the plaintiff suffered damages or loss as a result of the breach. *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459 (6th Cir. 2012) (applying Ohio law); *Gionino's Pizzeria Inc. v. Reynolds*, 7th Dist. Carroll No. 20 CA 0940, 2021-Ohio-1289, ¶ 27 (citing *Price v. Dillon*, 7th Dist. Mahoning Nos. 07-MA-75, 07-MA-76, 2008-Ohio-1178, ¶ 48). "A party breaches a contract if he fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Jarupan v. Hanna*, 2007-Ohio-5081, 878 N.E.2d 66, 73 (10th Dist.)).

Further, in Ohio, there is an implied duty of good faith in almost every contract. *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 462, 2005-Ohio-4850, 839 N.E.2d 49, ¶ 22 (1st Dist.). Ohio law requires the parties to "deal reasonably with each other," and this duty applies even where one party has discretionary authority to determine certain terms of the contract. *DavCo Acquisition Holding, Inc. v. Wendy's Intern., Inc.*, No. 2:07-cv-1064, 2008 WL 755283, at *6 (S.D. Ohio March 19, 2008) (citing *Littlejohn*, 839 N.E.2d at ¶ 28). However, Ohio law does not apply the

duty of good faith and fair dealing "where a party to the contract has the absolute and exclusive authority to make the decision at issue." *Id.* (citing *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003)).

To determine whether a breach occurred, the Court is tasked with interpreting the terms of the contract. The interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law to be made by the Court. *Savedoff*, 524 F.3d at 763 (citations omitted). In examining contracts, the Court must ascertain the intent of the parties. "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Id.* (quoting *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (1996)). Where the terms of the contract are not ambiguous, "courts are constrained to apply the plain meaning of the contract." *Id.* at 763 (citing *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E. 561, ¶ 18). Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Becker v. Direct Energy, LP*, 2018 EIR Cases 376,547, 2018-Ohio-4134, 112 N.E.3d 978, ¶ 51.

As a threshold matter, the Court finds that the contract is not ambiguous, therefore, it looks to the plain language of the agreement to determine the parties' intent. Show Me contends that THUSA breached Section 10.05 of the Development Agreement and the implied covenant of good faith and fair dealing for one or more of several reasons. These include the denial of RSW as its partner to coerce Show Me to enter into the ARA; failing to respond to, delayed, or outright rejection, without a basis, of Show Me's development proposals; closure of the Dublin Office; failure to introduce Show Me to its new operational/support team after months of Dublin Office closure; requiring Show Me to use an antiquated online system for tracking development and

construction; failing to provide ongoing support and assistance with general business operations; and suspending marketing in the St. Louis area.  The parties differ as to whether the duty of good faith and fair dealing is implied or express in this case.  Section 10.05 of the Development Agreement states that the parties "agree to act in good faith and use best efforts to comply with each of [their] respective obligations under th[e] Agreement[.]"  This section further provides that "the exercise of any right expressly permitted under th[e] Agreement will be deemed to be exercised in good faith."  (Pl.'s Ex. 34 § 10.05).  Although it is true that the implied covenant of good faith and fair dealing does not apply where a party to the contract has the absolute and exclusive authority to make a decision, as is the case here, the Development Agreement's express language incorporates the duty of good faith into the agreement in Section 10.05.  Notwithstanding, applying these principles to the case at hand, and after consideration of the evidence, the Court finds that Show Me has failed to prove by a preponderance of the evidence that THUSA acted in bad faith.  The Court addresses some of the actions or inactions alleged herein.

Show Me alleges that THUSA acted in bad faith by rejecting RSW as an equity partner, in an effort to coerce Show Me into entering into the ARA.  (FAC ¶¶ 176, 178).  The Court need not look further than the Development Agreement's express language to determine the parties' intent. The Development Agreement specifically states that the rights under the agreement were personal to Show Me and the agreement was entered into in reliance and in consideration of Sigurdson's personal trust, confidentiality, skill, qualifications of the current owners and employees, assignments required THUSA's consent.  (Pl.'s Ex. § 13.02).  To that end, the Development Agreement precludes Show Me from transferring any ownership interest without first obtaining THUSA's written consent.  (Pl.'s Ex. 34 § 13.02).  THUSA expressly retained the right to withhold its consent to an assignment if Show Me did not sufficiently verify that Eric Sigurdson would

retain a controlling interest or control the majority of Show Me's shares.  (*Id.*).  It is clear from this language, then, that THUSA entered into this development agreement relying on Sigurdson's experience in the field and his personal guarantees, and as such, it retained the right to approve any partner, subject to proof from Show Me that Sigurdson would retain a controlling interest or would control the majority of Show Me's shares.

In this case, Show Me introduced a potential new partner to THUSA and there is no dispute that Show Me needed THUSA's consent to go through with the RSW deal.  (*See* Trial Tr. Vol. 3 at 61:8–10).  Yet, Show Me contends that THUSA's refusal of the deal was unreasonable and not in good faith.  At trial, Sigurdson testified that the RSW deal involved an investment by RSW of approximately $2.4 million in exchange for 26% membership interest in Show Me.  (*Id.* at 61:13–17).  This 26% was comprised of 24% from Sigurdson's membership interest and 2% membership interest from the other partners.   (*Id.* at 61:20–21).  Before the deal, Sigurdson held 52% membership interest, but if the deal had gone through, he would have been left with only a 28% interest in Show Me.  (*Id.* at 61:24–62:4).  Importantly, RSW would have an option to acquire 8% of Sigurdson's interest in Show Me upon exercise and conversion, so that RSW would then have 34% ownership and Sigurdson only 20%.  (Pretrial Stip. at 11 ¶ 21).  Moreover, active management was going to be shared by Tottleben and Sigurdson.  (Trial Tr. Vol. 3 at 80:5–7; Pl.'s Ex. 229).  Given Show Me's dire financial condition at the time, Show Me needed the investment RSW was willing to make to meet its obligations under the Development Agreement.  (*See* Trial Tr. Vol. 3 at 55:5–23).  Nevertheless, because Sigurdson would not have been left with the controlling interest if the RSW deal had been successful, as required under the Development Agreement, THUSA was within its right to withhold its consent, and the Court cannot say that this was

unreasonable based on the evidence presented at trial.[8]

Nor does the Court find that THUSA did not put its best efforts in considering the deal. Indeed, the evidence shows that THUSA met with RSW representatives on several occasions in 2016, even after the Meeting in Oakville.  (*See* Pl.'s Ex. 279 (discussing a meeting between THUSA and Tottleben that took place on September 12, 2016 and a subsequent meeting between THUSA and Tottleben, Cawley, and Nietzel scheduled for September 28, 2016).  The discussions between THUSA and RSW continued into at least February 2017.  (Pl.'s Ex. 313).  Therefore, the Court does not find that THUSA's denial of RSW as Show Me's partner constitutes bad faith.

Show me also complains of the Dublin Office closure.  But THUSA had no contractual duty under the Development Agreement to maintain headquarters in the United States.  THUSA decided to move the Dublin Office to Oakville, Ontario in effort to create "one brand" where they could merge their teams in the United States and Canada, and access both markets in a "more expeditious" manner, given their close physical presence to their two largest U.S. markets.  (Trial Tr. Vol. 9 at 13:1–19).  Athayde explained that the Oakville office is located near Toronto, which is only about an hour-and-a-half drive from their two largest U.S. markets. (*Id.* at 13:9–12).  He further testified that virtually all of the staff reductions that occurred after the Dublin Office closure resulted from a change in the Tim Hortons business model, by which site selection and construction would no longer be performed by the franchisor.  (*Id.* at 15:4–16:12, 114:13–20).  Instead, the franchisees would perform these functions, eliminating the need for architects, engineers, contractors and others of THUSA's staff, historically at the Dublin, Ohio location.  (*Id.*).

Show Me contends, however, that THUSA's support began to wane upon THUSA's

_____

[8] That Sigurdson had not told THUSA executives he would not be left with a controlling interest after the RSW deal by the time the Meeting in Oakville took place is of no consequence here because THUSA continued working towards a deal with RSW even after the Meeting.

closure of its Dublin Office.  Show Me's position is that after the Dublin, Ohio office closure, Show Me was left "without the support THUSA had contractually agreed to provide so that Show Me [] could meet its development obligations under the [Development Agreement]."  (FAC ¶ 4). Yet, the testimony presented at trial belies this contention.  Athayde testified that in the second half of 2015—either after or around the time THUSA's Dublin Office closed—THUSA hired Kyley Mills, a new regional manager of real estate, to support Show Me in its development efforts. (Trial Tr. Vol. 9 at 33:23–34:15).  Ms. Mills was based in St. Louis because "it was important for [THUSA] to ensure that Mr. Sigurdson would have . . . a healthy development trajectory."  (*Id.* at 35:3–6).  Show Me presented no evidence to prove by a preponderance of the evidence that the decision to close the Dublin Office was made in bad faith or that THUSA failed to put its best efforts in performing its obligations under the Development Agreement after the office closed.

Show Me further claims that THUSA breached the Development Agreement by failing to properly and timely respond to development proposals.  According to Sigurdson, their development delays were caused in part by the Dublin Office transition to Oakville.  (Trial Tr. Vol. 4 at 73:1–10).  While it appears that there may have been some misunderstanding between the parties as to whether O'Brien and Lafayette were approved, (*see* Pl.'s Ex. 144 at SMH 10464), the Development Agreement does not impose an obligation onto THUSA to respond to real estate site proposals within a specified amount of time.  The only provision relating to site approval states that any real estate package is deemed rejected if not approved or rejected in 30 days.  (Pl.'s Ex. 34 § 4.01).  As such, Show Me should have treated these sites as denied after thirty days passed without formal approval from THUSA.

Even assuming *arguendo* that THUSA had acted in bad faith based on these or any of the alleged actions or inactions, Show Me failed to establish that its delays and ultimate failure to meet

24

its development obligations were proximately caused by THUSA or a breach of any legal duty. While THUSA may have been delayed in approving some sites in 2016, Show Me was already having delays in its development plans. As to O'Fallon and Lafayette, Show Me failed to meet its "best case scenario" and "fallback" projections by several months, even after THUSA approved the sites. (*Compare* Pl.'s Ex. 144 ("Best case scenario we open in April [2016], fallback we . . . open in June [2016].") *with* Def.'s Ex. 602 (noting that O'Fallon opened in August 2016 and Lafayette opened in December 2016)). Not only was Show Me delayed in the opening of these locations (along with two others), but THUSA in fact approved seven locations for 2016, only two of which actually opened. (*See* Trial Tr. Vol. 3 at 8–12; Def.'s Ex. 602). In total, Show Me was approved for fourteen locations, but only half of those were eventually opened. (*Id.*). Show Me failed to prove that its delays after having received THUSA's approval, or its failure to open seven approved locations in 2016, were caused by THUSA's actions or inactions.

Accordingly, the Court finds that THUSA is entitled to judgment in its favor as to Count I of the First Amended Complaint.

> ii.  Breach of the Franchise Agreements and Implied Covenant of Good Faith and Fair Dealing

To state a cause of action for a breach of contract under Florida law, there must be a valid contract, a material breach, and damages resulting from that breach. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)). The implied covenant of good faith and fair dealing is part of every contract in Florida. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999). That said, "the implied covenant of good faith and fair dealing confers limited rights." *Id.* at 1316. Indeed, "no independent cause of action exists under Florida law for breach of the implied covenant of good faith and fair dealing" absent a breach of the express terms of the contract. *Id.* at 1317. "When a

party to a contract has in good faith performed the express term of the contract, an action for breach of the implied covenant of good faith will not lie." *Id.* at 1317–18; *see also Tim Minn, Inc. v. Tim Hortons USA Inc.*, No. 20-23481-Civ, 2021 WL 4482733 (S.D. Fla. Aug. 2, 2021), *adopted*. Thus, the Court must first determine whether a breach of any express terms in the Franchise Agreements has occurred. *See Architectural Ingenieria Siglo XXI, LLC v. Dom. Rep.*, No. 13-cv-20544, 2017 WL 11630842, at *13 (S.D. Fla. Sept. 30, 2017) ("'[I]f a party cannot prove a breach of contract, its claims for breach of the implied covenant of fair dealing' must fail.").

In determining whether a breach occurred, the Court looks to the "clear and unambiguous words of the contract [as] the best evidence of the intent of two parties." *Burger King Corp. v. Hinton, Inc.*, 203 F. Supp. 2d 1357, 1361–62 (S.D. Fla. 2002) (citing *Murry v. Zynyx Mktg. Comms.*, 774 So. 2d 714, 715 (Fla. 3d DCA 2000)). The general language of a contract "must yield to specific language which deals with the matter at issue. *Id.* (citing *Genunzio v. Genunzio*, 598 So. 2d 129, 132 (Fla. 2d DCA 1992)).

Show Me alleges that THUSA breached the Franchise Agreements and the implied covenant of good faith and fair dealing for many of the same reasons it contends THUSA breached the Development Agreement. In particular, Show Me alleges that THUSA failed for several months after closing the Dublin Office to introduce Show Me to the new operational/support team; delayed and refused to provide itemized equipment price lists; charged significant and unreasonable "mark-ups" on equipment purchases and charging inflated management costs; failed to contribute all rebates it received from supplies to the TNAP; required Show Me to use an antiquated online system for tracking development and construction; failed to provide ongoing support and assistance in business operations; and suspended marketing in the St. Louis area.

The Court finds that none of the actions or inactions alleged by Show Me constitute a

breach of the Franchise Agreements.  For instance, Show Me complains of THUSA's failure to provide ongoing support and assistance, including marketing assistance in the St. Louis area.  Yet, the express terms of the Franchise Agreements state that THUSA will provide "other initial and ongoing advisory assistance to Franchisee concerning the marketing, merchandising, and general business operations of the Franchised Business, *as Franchisor deems appropriate."* (Pl.'s Ex. 258 § 3.03 (emphasis added)).  Moreover, section 18.08 of the Franchise Agreements provides that THUSA may exercise its discretion on the basis of its judgment of what is in its own best interest or in the best interests of the Tim Hortons System.  Similarly, as to Show Me's TNAP contributions, THUSA is offered broad discretion under the Franchise Agreements regarding the expenditure of advertising dollars.  In particular, THUSA is not obligated to direct advertising funds to a particular location.  Section 8.00 of the Franchise Agreements provides that, "Franchisor may in its reasonable discretion direct TNAP to allocate said contributions as between local, regional, and national advertising and promotional programs and may modify such allocation at its reasonable discretion from time to time." (Pl.'s Ex. 258 §§ 8.00, 8.02).  Under these terms, "the fact that [THUSA] maintains the sole reasonable discretion to determine the way in which it provides the enumerated services in the Franchise Agreement bars [Show Me's] breach of contract claim" and by consequence breach of the implied covenant of good faith and fair dealing.  *Hinton, Inc.*, 203 F. Supp. 2d at 1362.

Even if there had been a breach, however, Show Me's claim also fails because the evidence presented at trial rebuts the contention that THUSA acted in bad faith.  Athayde testified that even after the Meeting, THUSA continued providing assistance to Show Me.  He also testified that THUSA hired Ms. Mills to assist Sigurdson in its development efforts, and that it was in THUSA's best interest to see Sigurdson succeed.  THUSA cannot be said to have acted in bad faith in

performing its obligations. (Trial Tr. Vol. 9 at 33:23–34:15). The evidence at trial showed that the parties' continued working together to open new locations in 2016. Thus, while Show Me may not have been satisfied with the support it was receiving, the Court cannot say THUSA's actions constituted a breach of the express terms of the Franchise Agreements or of the implied covenant of good faith and fair dealing.

Based on the evidence presented at trial, the Court finds that Show Me failed to meet its burden of proving by a preponderance of the evidence that THUSA breached any provisions of the Franchise Agreements, and by consequence, that THUSA breached the implied covenant of good faith and fair dealing. As such, THUSA is entitled to judgment in its favor as to Count III of the First Amended Complaint.

### C. THUSA's Counterclaims

THUSA filed a counterclaim against both Show Me and Sigurdson for breach of the Franchise Agreements and breach of the Development Agreement, and against Sigurdson only for breach of the Guarantee. (ECF No. 50). For the reasons stated below, the Court finds that THUSA satisfied its burden and proved its claims by a preponderance of the evidence.

*1) Breach of the Franchise Agreements and the Development Agreement*

THUSA alleges that Show Me breached the Franchise Agreements and Area Development Agreement (Counts I and II of the Counterclaim) by failing to pay to THUSA amounts due under the Franchise Agreements for royalties, advertising, and other amounts. As previously stated, the elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages. *Vega*, 564 F.3d at 1272; *see V & M Star Steel*, 678 F.3d at 465. Show Me and Sigurdson assert that THUSA's prior material breaches of contract and repudiation are the causes of these deficiencies, and any such amounts accrued after, and as a result of, THUSA's wrongful conduct.

As a result, they contend, THUSA's claims must be rejected and dismissed, or, alternatively, that Show Me's damages should be offset by the amount Show Me owes THUSA. Because the Court finds that Show Me failed to prove that THUSA breached the Agreements, Show Me's arguments are without merit.

Pursuant to the Franchise Agreements, Show Me was obligated to make payments to THUSA for royalties, advertising, and other fees. Specifically, the Franchise Agreements require Show Me to pay THUSA a royalty of 1%, 3%, or 6% of weekly gross sales for a period of time ultimately reverting to 6% in return for the use of the Tim Hortons system and proprietary marks. (Pl.'s Ex. 258 § 4.01). Additionally, the Franchise Agreements obligate Show Me to pay THUSA 4% of Show Me's monthly gross sales for the preceding calendar month in return for advertising, sales promotion, and public relations expenditures made by THUSA on behalf of the entire Tim Hortons system. (*Id.* § 8.00). Show Me was also required to make payments to THUSA for products, fixtures, furnishings, equipment, décor, signs, supplies, paper goods, services, ingredients, and other items. (*Id.* § 5.05(d)). Likewise, the Development Agreement required Show Me to make payment to THUSA for amounts due under the agreement, and all amounts due to THUSA or its affiliates from Show Me for any other reason. (Pl.'s Ex. 34 § 10.01).

THUSA presented documentary evidence, as well as the testimony of its Head of Franchising, Stephen Ostaszewicz, as to the amounts that are due from Show Me and Sigurdson. This amount totals $662,653.00. (Def.'s Ex. 593; Trial Tr. Vol. 13 at 48:6–49:3). Show Me challenged some of the amounts due, in particular amounts claimed for NSF's. Ostaszewicz testified that this category of items represented money originally posted to the account for the benefit of Show Me, but which THUSA was ultimately prevented from withdrawing due to stop payment authorizations from Show Me. (*See* Trial Tr. Vol. 13 at 59:20–24). At trial, Sigurdson

acknowledged that these details would have been handled by his accounting department, and that he lacked personal knowledge of whether the amounts were proper. (*Id.* at 88:4–89:13).  Because he lacked personal knowledge, the Court does not find his testimony credible.

Accordingly, it is the finding of this Court that Show Me breached the Franchise Agreements and the Development Agreement by failing to pay amounts due.  Show Me owes THUSA a total of $622,653.00.[9]  THUSA is therefore entitled to judgment on Counts I and II of the Counterclaim and Third-Party Complaint.

2) *Breach of the Guarantee*

THUSA also seeks judgment against Counter-Defendant Sigurdson pursuant to the written guarantee whereby he "unconditionally" guaranteed each and every one of Show Me's obligations under the Franchise Agreements and Development Agreement, including all of the money due to THUSA by Show Me.  (Pl.'s Ex. 258 at Attach. A; Pl.'s Ex. 34 at Attach. A).  "A guaranty is a collateral promise to answer for the debt or obligation of another."  *Fed. Deposit Ins. Corp. v. Univ. Anclote, Inc.*, 764 F.2d 804, 806 (11th Cir. 1985) (citing *Nicolaysen v. Flato*, 204 So. 2d 547, 549 (Fla. 4th DCA 1967)).  Under Florida law, "rules applicable to contracts generally apply to guaranty contracts."  *Burger King Corp. v. Huynh*, No. 11-22602-CIV, 2011 WL 6190163, at *6 (S.D. Fla. Dec. 5, 2011).  Because Sigurdson personally guaranteed all of Show Me's obligations under the Franchise Agreements, he also breached the Guarantee agreement.  *Id.*; *Wendy's Intern., v. Saverin*, 337 F. App'x 471, 478 (6th Cir. 2009) (applying Ohio law and affirming district court's decision that guarantor of franchise agreement was personally liable); *see also One Hour Air Conditioning Franchising, L.L.C. v. Jerry's Comfort Experts, Inc.*, No. 8:14-

---

[9] The parties stipulated that attorneys' fees and costs would be separately addressed post-trial in accordance with the Court's ruling.  (Pretrial Stip. at 24, 29).

CV-994-T-EAK-TGW, 2015 WL 2095199, at *3 (M.D. Fla. May 5, 2015) (finding that franchisee was liable to franchisor for failure to make payments and therefore guarantors were liable for breach of guarantee).

Because Show Me is liable to THUSA for breaching the Franchise Agreements and Development Agreement, Sigurdson, by way of his guarantee, is personally liable for the same. THUSA is entitled to judgment on Count III of the Counterclaim and Third Party Complaint.

## III.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that:

1.      THUSA is entitled to judgment in its favor and against Show Me on Counts I through III of the First Amended Complaint.

2.      THUSA is entitled to judgment in its favor and against Show Me on Counts I and II of its Counterclaim and Third Party Complaint.

3.      THUSA is entitled to judgment in its favor and against Eric Sigurdson on Count III of the Counterclaim and Third Party Complaint.

4.      THUSA is awarded $622,653.00 in damages.  Final judgment shall be entered by separate order.

5.      The Clerk is directed to mark this case as **ADMINISTRATIVELY CLOSED**.

DONE and ORDERED in Chambers at Miami, Florida this 21st day of April, 2022.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
All counsel of record